JEAN-PAUL JASSY (SBN #205513)
JASSY VICK CAROLAN LLP
355 S Grand Ave, Ste 2450
Los Angeles, CA 90071
Telephone: 310-870-7048
Facsimile: 310-870-7010
jpjassy@jassyvick.com

*Counsel for Amici Curiae*

LISA ZYCHERMAN
MARA GASSMANN
ABIGAIL SINTIM
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone: 202-795-9300
lzycherman@rcfp.org

*Of counsel*

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**Pro Publica Inc.,**

***Plaintiff,***

**v.**

**Vice Admiral Lia Reynolds; Carlos Del Toro; Caroline D. Krass; and Lloyd J. Austin, III,**

***Defendants.***

**Case No. 3:22-CV-1455-BTM-KSC**

**PROPOSED AMICI CURIAE BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 34 MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFF's MOTION FOR SUMMARY JUDGMENT**

**Date: February 21, 2025**
**Time: 11:00 a.m.**
**Judge: Hon. Barry Ted Moskowitz**

## TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES .................... iii

IDENTITY AND INTEREST OF AMICI CURIAE .................... 1

INTRODUCTION .................... 4

ARGUMENT .................... 6

I. The right of access to military court proceedings and records permits public oversight and ensures government accountability .................... 6

A. The qualified First Amendment right of public access to court martial proceedings is well settled. .................... 6

B. The access right is one of contemporaneous access, which serves the public interest in obtaining timely information. .................... 12

C. Congress enacted a statutory right of access to further ensure public access to military courts. .................... 13

II. The public relies on and benefits from press coverage of the military, and the Navy's fight for secrecy will stymie important news reporting. .................... 15

CONCLUSION .................... 19

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*ABC, Inc. v. Powell*,
47 M.J. 363 (C.A.A.F. 1997) .......... 7, 8

*Associated Press v. U.S. Dist. Ct. for C.D. Cal.*,
705 F.2d 1143 (9th Cir. 1983) .......... 6, 12

*Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*,
117 F.4th 1200 (9th Cir. 2024) .......... 6, 9, 11

*Courthouse News Serv. v. Planet*,
947 F.3d 581 (9th Cir. 2020) .......... 12

*Courthouse News Serv. v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) .......... 12

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) .......... 15

*F.T.C. v. Standard Fin. Mgmt. Corp.*,
830 F.2d 404 (1st Cir. 1987) .......... 9, 11

*Forbes Media LLC v. United States*,
61 F.4th 1072 (9th Cir. 2023) .......... 9

Globe Newspaper Co. v. Superior Ct.,
457 U.S. 596 (1982) .......... 7

*Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*,
24 F.3d 893 (7th Cir. 1994) .......... 12, 13

*Hartford Courant Co., LLC v. Carroll*,
986 F.3d 211 (2d Cir. 2021) .......... 9

*In re Knoxville News-Sentinel Co.*,
723 F.2d 470 (6th Cir. 1983) .......... 10

*Int'l News Serv. v. Associated Press*,
248 U.S. 215 (1918) .......... 13

*Leigh v. Salazar*,
677 F.3d 892 (9th Cir. 2012) .......... 2

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) .......... 13

*Nixon v. Warner Commcn's, Inc.*,
435 U.S. 589 (1978) .......... 10

*Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*,
464 U.S. 501 (1984) .......... 4, 7, 8, 10

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) .......... 3, 6, 7, 15

*United States v. Brooklier*,
685 F.2d 1162 (9th Cir. 1982) .......... 12

*United States v. Hasan*,
84 M.J. 181 (C.A.A.F. 2024) .......... 7

*United States v. Hershey*,
20 M.J. 433 (C.M.A. 1985) .......... 7, 12

*United States v. Kravetz*,
706 F.3d 47 (1st Cir. 2013) .......... 11

*United States v. Ortiz*,
66 M.J. 334 (C.A.A.F. 2008) .......... 8

*United States v. Rosen*,
487 F. Supp. 2d 703 (E.D. Va. 2007) .......... 10, 11

*United States v. Scott*,
48 M.J. 663 (A. Ct. Crim. App. 1998) .......... 8

*United States v. Story*,
35 M.J. 677 (A.C.M.R. 1992) .......... 8

*United States v. Travers*,
25 M.J. 61 (C.M.A. 1987) .......... 7, 8, 11

*United States v. Valigura*,
54 M.J. 187 (C.A.A.F. 2000) .......... 15

*Valley Broad. Co. v. U.S. Dist. Ct. of Nev.*,
798 F.2d 1289 (9th Cir. 1986) .......... 6

*Wash. Post v. Robinson*,
935 F.2d 282 (D.C. Cir. 1991) .......... 9

**Statutes:**

10 U.S.C. § 836 .......... 15

10 U.S.C. § 940a .......... 5, 14

**Other Authorities:**

Adam Klasfeld, *Manning Did Not 'Aid the Enemy' by Spilling Secrets to WikiLeaks*, Courthouse News Serv. (July 30, 2013) .......... 13

Carl Prine, *Navy Dismisses More SEAL War Crimes Cases, Removes Controversial Prosecutor*, Navy Times (Aug. 6, 2019) .......... 18

Darren Samuelsohn, *Military Still Secretive On Sex Crimes*, POLITICO (Sept. 25, 2013) .......... 14

Dave Phillips, *Disposable: Surge in Discharges Includes Wounded Soldiers*, The Gazette (May 19, 2013) .......... 16

David A. Schlueter, *Reforming Military Justice: An Analysis of the Military Justice Act of 2016*, 49 St. Mary's L.J. 1 (2017) .......... 14

*David Phillips of* The Gazette*, Colorado Springs, CO*, The Pulitzer Prizes (last visited Jan. 23, 2025) .......... 17

Dienes, Levine and Lind, *Newsgathering and the Law* (3d ed. 2005) .......... 6

Emily Crockett, *The War in Congress Over Rape in the Military, Explained*, Vox (June 8, 2016) .......... 14

Geoff Ziezulewicz, *Navy Chief Convicted for Bahrain Sex Crimes Loses Court Appeal*, Navy Times (Dec. 9, 2020) .......... 17

Geoff Ziezulewicz, *Tinder, Sailor, Hooker, Pimp: The U.S. Navy's Sex Trafficking Scandal in Bahrain*, Mil. Times (June 16, 2020) ........ 17

Geoff Ziezulewicz, *Why the Navy Struggled to Convict in Bahrain Sex Crime Cases*, Navy Times (June 16, 2020) ........ 18

Gina Harkins, *Senators Demand 'Immediate Action' After Explosive Report on Navy Sex Trafficking* Scandal, Military.com (July 29, 2020) ........ 17

Kyle Rempfer, *Bowe Bergdahl Loses Unlawful Command Influence Appeal Based on Trump Tweets*, Mil. Times (July 17, 2019) ........ 13

Letter from Rachel E. VanLandingham, President, Nat'l Inst. of Mil. Just. to Hon. Caroline D. Krass, Gen. Couns., Dep't of Def. (Sept. 19, 2022) ........ 15

Letter from Reporters Committee and 38 Media Orgs. to C. Krass, Gen. Couns., Dep't of Def. (Sept. 13, 2022) ........ 3, 14

Media Insight Project, *How Americans Describe Their News Consumption Behaviors*, Am. Press Inst. (June 11, 2018) ........ 13

Mil. Just. Rev. Panel, *Comprehensive Review and Assessment of the Uniform Code of Military Justice* (December 2024) ........ 11

*Other than Honorable*, The Gazette (last visited Jan. 6, 2025) ........ 16

*Report of the Military Justice Review Group, Part I: UCMJ Recommendations* ("Report") Mil. Just. Rev. Grp. (Dec. 22, 2015) ........ 5

*Sex Crime Coverup: Senators Attack Lack Of Transparency In Military Justice System*, First Amendment Coal. (Dec. 10, 2015) ........ 14

Toni Locy, *Covering America's Courts: A Clash of Rights* 13 (2d ed. 2013) ........ 13

**Rules:**

JAG Instr. 5813.2 ........ 5

R.C.M. 806 ........ 7

## IDENTITY AND INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), and the following news and media organizations (together, "amici"):

1. American Broadcasting Cos., Inc. d/b/a ABC News
2. The Associated Press
3. The Atlantic Monthly Group LLC
4. Courthouse News Service
5. Dow Jones & Co. (incl. The Wall Street Journal)
6. The E.W. Scripps Company
7. First Amendment Coalition
8. Gannett Co., Inc.
9. Inter American Press Association
10. The Intercept Media, Inc.
11. Los Angeles Times Communications LLC
12. The Media Institute
13. MediaNews Group Inc.
14. Military Reporters & Editors
15. Military.com
16. National Freedom of Information Coalition
17. National Newspaper Association
18. The National Press Club
19. National Press Photographers Association
20. The New York Times Company
21. News/Media Alliance
22. Nexstar Media Inc.
23. Online News Association
24. Radio Television Digital News Association

25. Sightline Media Group (incl. The Navy Times, The Army Times, and Defense News)
26. Sinclair Broadcast Group, Inc.
27. Slate
28. Society of Environmental Journalists
29. Society of Professional Journalists
30. Student Press Law Center
31. TEGNA Inc.
32. Tully Center for Free Speech
33. Vox Media, LLC
34. The War Horse News

Lead amicus the Reporters Committee is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. (Statements of interest for all amici are set forth in the motion for leave to which this proposed brief is appended.)

Amici file this brief in support of the Motion for Summary Judgment filed by Plaintiff Pro Publica, Inc. ("ProPublica"). ECF No. 88. As news organizations and other organizations that advocate for the First Amendment and newsgathering rights of the press, amici have a strong interest in safeguarding the public's presumptive right to access court proceedings and records, including in courts martial, and have previously filed as amici in federal courts concerning access. *See, e.g.*, Brief of Amici Curiae RCFP and NPPA, *Leigh*

*v. Salazar*, 677 F.3d 892 (9th Cir. 2012).[1] Prompt access to judicial hearings and records is essential for journalists, in their role as "surrogates for the public," to gather information and keep the public informed about court cases of public interest. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). It is from this perspective that amici write to emphasize the public interest in this case and the importance to the wider press and public of timely access to proceedings and records of courts-martial.

///

///

///

[1] Amici's interest includes this matter specifically. The Reporters Committee previously filed an unopposed motion for leave to proceed as amicus curiae in support of ProPublica's motion for a preliminary injunction. ECF No. 14. The parties subsequently stipulated to a stay of proceedings, and the Court denied the motion as moot without prejudice to renew. ECF Nos. 15, 16, 43. The Reporters Committee, joined by 38 media organizations, also sent a letter to Department of Defense General Counsel Caroline D. Krass regarding the Department's prior guidance on Article 140a of the Uniform Code of Military Justice and its application to access requests, including ProPublica's here. *See* Letter from Reporters Committee and 38 Media Orgs. to C. Krass, Gen. Couns., Dep't of Def. (Sept. 13, 2022), *available at* https://www.documentcloud.org/documents/22415281-2022-09-13-us-v-mays-news-media-coalition-letter/.

## INTRODUCTION

The public's presumptive right of access to court records in criminal matters, guaranteed by the First Amendment, is essential to public trust in—and the effective functioning of—institutions charged with applying and enforcing the law. Press and public access promotes accountability, ensures that proceedings are fair and that those subjected to government process are not wrongfully deprived of their liberty, and fosters confidence in the system. *See Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 508 (1984) ("Openness enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the criminal justice system"). For these reasons, the First Amendment ensures the public a presumptive right to observe criminal proceedings and inspect records—a right that is overcome only when, and only to the extent that, the government demonstrates a compelling interest in closure. And as military courts and the Armed Forces' rules recognize, this qualified constitutional right of access applies in court-martial proceedings.

Yet despite that recognition, Defendants (hereinafter, the "Navy") have denied the press and public access to nearly all records in the court-martial of Seaman Apprentice Ryan Mays, USN, who was charged with setting the July 2020 fire that destroyed the USS *Bonhomme Richard*, and the records in numerous other matters in which ProPublica, a non-profit news organization, has sought access, based on policies that lack legal foundation. At issue are records, including written court orders and documents discussed in open court that are not classified, sealed, or privileged, and proceedings for which there is an uncontested tradition of openness. In the Mays case, for example, the withheld documents are ones that in other court-martial proceedings have been released, if not contemporaneously, within a matter of days. Mays was acquitted, and there remain open questions concerning one of the country's worst non-combat warship disasters, including why Mays was prosecuted despite internal recommendations against doing so. The public interest in Mays' court-martial and in the other proceedings that ProPublica discusses in its Motion for Summary Judgment is substantial. The Navy's positions that it will "not

publish any court filings or records in cases that result in a full acquittal," *see* JAG Instr. 5813.2, and its refusal to afford adequate public notice of hearings are contrary to both law and the public interest.

Congress recognized these very concerns when it enacted Article 140a of the Uniform Code of Military Justice to facilitate "timely access to dockets, filings, and rulings" at all stages of court-martial proceedings. *Report of the Military Justice Review Group, Part I: UCMJ Recommendations* ("Report") Mil. Just. Rev. Grp. at 1012 (Dec. 22, 2015), https://perma.cc/M5ZF-JLZH; 10 U.S.C. § 940a(a)(4). For good reason: Without advance knowledge of military proceedings and without access to the accompanying records, members of the press, including but not limited to ProPublica, are unable to report on these important proceedings. Journalists may miss court-martial hearings altogether, for example, and without access to the records used in the proceedings they do observe, they may be prevented from understanding what occurred and the basis for important decisions. The public cannot assess the Navy's decision to proceed with Mays' trial despite a preliminary hearing officer's recommendation to the contrary, by way of example, and to determine whether that trial was fairly conducted without the records underlying the proceedings. In a range of military justice matters, service members and institutional interests alike benefit from transparency. At base, access ensures that justice is served.

Timeliness is a vital component of the qualified right of access. Contemporaneous access to court-martial proceedings (and notice thereof), and prompt access to records enable the media to report on the outcomes of prosecutions, and the reasons underlying prosecutorial and judicial decisions, while the public interest is at its height. And as amici explain below, there are many examples of public interest reporting concerning issues of military justice that, without timely disclosure, might never have been published—to the detriment of the public and the system itself. For these reasons, amici write to urge this Court to safeguard the right of access by granting ProPublica's motion for summary judgment and denying the cross-motion for summary judgment filed by Defendants.

## ARGUMENT

### I. The right of access to military court proceedings and records permits public oversight and ensures government accountability.

#### A. The qualified First Amendment right of public access to court-martial proceedings is well settled.

The press and public have a right of access to criminal proceedings and records rooted in the First Amendment and the common law. *See Richmond Newspapers, Inc.*, 448 U.S. at 556 ("the right to attend criminal trials is implicit in the guarantees of the First Amendment without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated"); Dienes, Levine and Lind, *Newsgathering and the Law* § 3.01[1] (3d ed. 2005) ("Courts have extended the First Amendment right of access to preliminary hearings, suppression hearings, bail and detention hearings, competency hearings, and plea hearings. Today, almost all pretrial proceedings are presumptively open." (collecting cases)); *Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*, 117 F.4th 1200, 1204 (9th Cir. 2024) ("Under the First Amendment, the press and the public have a presumed right of access to court proceedings and documents." (citation and quotation marks omitted)).

Access to court proceedings and records are "important to a full understanding of the way in which the judicial process and the government as a whole are functioning." *Associated Press v. U.S. Dist. Ct. for C.D. Cal.*, 705 F.2d 1143, 1145 (9th Cir. 1983) (applying right of access to pretrial court records) (internal quotation marks omitted); *see also Valley Broad. Co. v. U.S. Dist. Ct. of Nev.*, 798 F.2d 1289, 1293 (9th Cir. 1986) (holding that access to court documents "helps the public keep a watchful eye on public institutions and the activities of government" (internal citation omitted)). It "leads to a better-informed citizenry," which "tends to deter government officials from abusing the powers of government," *Civ. Beat L. Ctr. for Pub. Int., Inc.*, 117 F.4th at 1207 (citation omitted), and "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government," *Globe Newspaper Co. v.*

*Superior Ct.*, 457 U.S. 596, 604 (1982). The First Amendment right is a qualified one that recognizes the "presumption of openness may be overcome," but only where the government demonstrates "an overriding interest" that allows a court to make specific "findings that closure is essential to preserve higher values and is narrowly tailored to serve that [overriding] interest." *Press-Enter. Co.*, 464 U.S. at 502.

Military courts have consistently held that the qualified right of access applicable to criminal proceedings, generally, applies in court-martial proceedings, including in Article 32 proceedings. *See, e.g.*, *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987) ("There can be no doubt that the general public has a qualified constitutional right under the First Amendment to access to criminal trials. . . . The right to public access to criminal trials extends to courts-martial." (citing *Richmond Newspapers, Inc.*, 448 U.S. 555); *United States v. Hershey*, 20 M.J. 433, 435–36 (C.M.A. 1985) (recognizing public right of access to court-martial); *United States v. Hasan*, 84 M.J. 181, 204 & n.12 (C.A.A.F. 2024) (same); *ABC, Inc. v. Powell*, 47 M.J. 363, 365 (C.A.A.F. 1997) ("[A]bsent 'cause shown that outweighs the value of openness,' the military accused is likewise entitled to a public Article 32 investigative hearing." (quoting *Press–Enter. Co.*, 464 U.S. at 509)); *see also* R.C.M. 806 (Rules of Court-Martial for the U.S. Armed Forces stating that court-martial proceedings should be open to the public). As the court in *United States v. Hasan* explained, "conducting criminal trials in public is of paramount constitutional concern" because "[p]ublic trials ensure that judges and prosecutors act professionally; they reduce the chances of arbitrary and capricious decision-making; they encourage witnesses to come forward; [and] they discourage perjury[.]" 84 M.J. at 204. Importantly, they also "enhance public confidence in the court system." *Id.* Affirming the right of access, this country's highest military court has noted that "public confidence in matters of military justice would quickly erode if courts-martial were arbitrarily closed to the public." *Travers*, 25 M.J. at 62.

In a military court proceeding, as in other criminal proceedings, to overcome the public's presumptive right of access an "overriding interest" in closure must be shown.

*E.g.*, *Travers*, 25 M.J. at 62 (citing *Press-Enter. Co.*, 464 U.S. 501). "[P]rior to excluding all or portions of the public from viewing a court-martial, the military judge must articulate findings warranting, and limiting as narrowly as possible, the infringement upon the constitutional right of the public to attend courts-martial of the United States." *United States v. Story*, 35 M.J. 677, 678 (A.C.M.R. 1992), *aff'd*, (C.M.A. Mar. 11, 1993); *see United States v. Ortiz*, 66 M.J. 334, 342 (C.A.A.F. 2008) (reversing conviction of military officer in closed proceeding where government had not clearly identified an overriding interest in closure and military judge had not articulated specific factual findings, thereby violating defendant's Sixth Amendment right to a public trial); *Powell*, 47 M.J. at 364, 366 (holding that preliminary hearing had to remain open to the public unless the Army could show a specific and substantial need for secrecy).

This standard also applies to the sealing of records introduced in court-martial proceedings. The Army Court of Criminal Appeals, for example, applied the qualified First Amendment right of public access to documents admitted in evidence at a pretrial proceeding held in connection with a court-martial. *United States v. Scott*, 48 M.J. 663, 666 (A. Ct. Crim. App. 1998). In that case, the court below had made no findings of fact to support its conclusion that privacy interests justified sealing a stipulation of facts. The Army Court of Criminal Appeals reversed that sealing order. *Id.* In so doing, it observed that just as "the general public has a qualified constitutional right of access to materials entered into evidence in federal criminal trials" concomitant with its right of access to the trial itself, "[t]his qualified right of access to materials entered into evidence may apply with equal validity to exhibits that were presented in public at a trial by court-martial." *Id.* (citation omitted). Indeed, while access to the proceedings themselves permits the public to observe what the courts are doing, access to the records introduced in connection with a proceeding allow the public to fully understand the court's decisions and perform its public oversight role. *See Wash. Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) (setting forth widely accepted rationale that judicial documents "have traditionally been open to the public" because public access to them "enhances both the basic fairness of the criminal

[proceeding] and the appearance of fairness so essential to public confidence in the system").

Here the Navy resists disclosure by asserting, *inter alia*, that the right of access does not attach to court-martial documents. To be clear, the Navy concedes, as it must, that the right of access attaches in court-martial proceedings, but it argues that the records from the proceeding are not open because they contain information that has not been historically publicly available. This argument is easily rejected. It relies on a "'narrow focus on categories of documents'" divorced from the underlying proceeding, an approach the Ninth Circuit expressly rejected just last year. *Civ. Beat L. Ctr. for Pub. Int., Inc.*, 117 F.4th at 1209 (quoting *Forbes Media LLC v. United States*, 61 F.4th 1072, 1083 (9th Cir. 2023)). As the court explained, "in making the threshold right of public access determination," judges do not "consider the categories of documents sought abstracted from the proceedings in which they were generated. Instead, [they] must . . . evaluate court records in the context of [the] proceedings" from which they are sought. *Id.* (internal citation omitted). By way of example, the Ninth Circuit pointed to cases in which, "in determining whether the right attaches to pre-indictment search warrant *materials*, [it] evaluated whether there was a history of public access to warrant *proceedings* and whether public access would support the functioning of those proceedings." *Id.* (citation omitted); *see also Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 220 (2d Cir. 2021). Given the consistent application of the First Amendment right in military proceedings like the one involving Mays, the Navy's argument that the First Amendment right does not attach to the documents from that proceeding fails.[2]

---

[2] To the extent that the Navy is arguing that the press does not have an absolute right to documents used in connection with court proceedings, this is a straw man. The right of access "can be blunted if 'court files might . . . become a vehicle for improper purposes' or where access could interfere with the administration of justice." *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) (quoting *Nixon v. Warner Commcn's, Inc.*, 435 U.S. 589, 598 (1978)). "Yet, the presumption is no mere paper tiger. . . . [T]he citizens'

Nor do conclusory invocations of national security justify withholding of materials from a public trial. *See, e.g.*, *United States v. Rosen*, 487 F. Supp. 2d 703, 716 (E.D. Va. 2007) (explaining that "as an abstract proposition" the government's interest in protecting national security information "can be a qualifying compelling and overriding interest" but it "must make a specific showing of harm to national security in specific cases to carry its burden in this regard" (citing *Press–Enter. Co.*, 464 U.S. at 510)). The Navy here fails to justify, by setting forth specific reasons tied to the actual documents at issue, the withholding of records from a public trial. *See id.* at 716–17.

> The government's *ipse dixit* that information is damaging to national security is not sufficient to close the courtroom doors nor to obtain the functional equivalent[.] . . . [Courts] require a judicial inquiry into the legitimacy of the asserted national security interest, and specific findings, sealed if necessary, about the harm to national security that would ensue . . . . Granting that national security concerns can justify appropriately tailored trial closures, the government nonetheless bears the burden of demonstrating, as a factual matter, that harm to national security would result from failing to close the trial.

*Id.* (citing, *inter alia*, *In re Washington Post,* 807 F.2d 383, 391–92 (4th Cir. 1986) (rejecting government's argument that courts should defer to Executive Branch assertions that trial closures are necessary for national security reasons and stating that a proceeding cannot be closed merely because the case implicated CIPA at an earlier stage))). It bears emphasis that in its recently issued report, the Military Justice Review Panel likewise asserted that courts-martial should be open, prior notice of proceedings available, and documents accessible. *See* Mil. Just. Rev. Panel, *Comprehensive Review and Assessment of the Uniform Code of Military Justice* (December 2024), available at

---

right to know is not lightly to be deflected . . . and '[o]nly the most compelling reasons can justify non-disclosure of judicial records.'" *Id.* (quoting *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 476 (6th Cir.1983)).

https://mjrp.osd.mil/sites/default/files/MJRP%202024%20Comprehensive%20Review%20and%20Assessment%20of%20the%20UCMJ.pdf. In issuing its recommendations urging adherence to current transparency standards and introducing others, the panel did not suggest that threats to national security provide a blanket reason to close categories of hearings or records, or to conceal knowledge of proceedings in a range of cases. This guidance by the panel further highlights that the Navy is wrong as a matter of both the law and fact to "invoke 'national security' broadly and in a conclusory fashion." *Rosen*, 487 F. Supp. 2d at 717.

Nor do generalized privacy concerns, without specific reasons for denying access and withholding documents, represent an overriding interest. *See, e.g.*, *Civ. Beat L. Ctr. for Pub. Int., Inc.*, 117 F.4th at 1209 (rejecting categorical sealing of records containing health information and requiring any limitations on access be justified on case-by-case basis with specific reasons).[3] Surely, its refusal as a matter of policy to deny access to records where a service member is acquitted does not satisfy an overriding interest in privacy. For the criminal defendant's part, an acquittal usually represents vindication.[4]

---

[3] There are numerous examples of the parties or government attempting to thwart press access to records from judicial proceedings, with courts closely scrutinizing and rejecting bald invocations of privacy. *See, e.g.*, *Standard Fin. Mgmt. Corp.*, 830 F.2d at 412 (holding that, while privacy is a category of interests that under certain facts may require the access right to yield, party seeking to seal judicial documents provided "no sufficiently compelling reasons to warrant cloaking the documents in secrecy"); *United States v. Kravetz*, 706 F.3d 47, 58 (1st Cir. 2013) (rejecting argument that third-party letters submitted in connection with sentencing should be categorically sealed, and presumption of access defeated, to protect writers' privacy; despite "a legitimate concern that the routine disclosure of third-party letters may discourage valuable input from the community during the sentencing process . . . that concern ordinarily would appear to be outweighed by positive gains").

[4] In this case, Mays supports release of the documents, yet even were it otherwise, his preference for privacy would not be dispositive; like the government, a criminal defendant seeking closure must show an overriding concern to which the First Amendment interest yields. *Travers*, 25 M.J. at 62. To the extent that acquittal has prompted *the government*

Withholding records here, where the proceedings were open to the public and the records were not subject to a protective order, cannot withstand scrutiny.

**B. The access right is one of contemporaneous access, which serves the public interest in obtaining timely information.**

"[A] necessary corollary of the right to access is a right to timely access." *E.g.*, *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (collecting cases). As the Ninth Circuit has explained, because "old news" often "does not receive[] much public attention," denying access "'at the time [the] audience would be most receptive would be effectively equivalent to a deliberate statutory scheme of censorship.'" *Planet*, 947 F.3d at 594 (citation omitted); *accord Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) ("The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure . . . may have the same result as complete suppression."). Thus, absent a compelling justification by the government, delays in access to court filings, even brief ones, have been found to be unconstitutional. *See, e.g.*, *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021) (requiring courts to provide access to new civil complaints on same day as filed); *Associated Press*, 705 F.2d at 1147 (vacating order imposing 48-hour sealing period on criminal case records as "a total restraint on the public's first amendment right of access even though the restraint is limited in time"); *United States v. Brooklier*, 685 F.2d 1162, 1172–73 (9th Cir. 1982) (holding that delayed release of transcript of closed suppression hearing until end of trial violated right of access).

Prompt access to judicial records ensures that the public learns about important cases while they are still newsworthy, promotes accuracy in reporting, and informs public debate

---

to desire secrecy—for example, over concerns about its own handling of the investigation or prosecution that led to the acquittal—this would not be a basis for overcoming the access right. "[M]ere . . . 'embarrassment'" does not amount to a compelling interest justifying closure of court martial proceedings. *See Hershey*, 20 M.J. at 436.

about cases and the institutions handling them. *Planet*, 947 F.3d at 594; *see also Grove Fresh Distribs., Inc.*, 24 F.3d at 897 (delaying disclosure "undermines the benefit of public scrutiny"). According to one study, "nearly two-thirds of adults now say they look at news at least several times a day." Media Insight Project, *How Americans Describe Their News Consumption Behaviors*, Am. Press Inst. (June 11, 2018), https://perma.cc/M3L2-84PB; *see also* Toni Locy, *Covering America's Courts: A Clash of Rights* 13 (2d ed. 2013). This reflects the reality that the public recognizes the "value of news" and relies on the press for timely, accurate information about our increasingly complex and interconnected modern world. *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 235 (1918) ("The peculiar value of news is in the spreading of it while it is fresh."); *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 561 (1976) ("[T]he element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly.").

Journalists—including those covering the military justice system—routinely rely on contemporaneous access to court records to disseminate breaking news about matters of public concern. *See, e.g.*, Kyle Rempfer, *Bowe Bergdahl Loses Unlawful Command Influence Appeal Based on Trump Tweets*, Mil. Times (July 17, 2019), https://perma.cc/5YA4-AKW3 (reporting on, and linking to, new appeals court ruling on Bowe Bergdahl court-martial); Adam Klasfeld, *Manning Did Not 'Aid the Enemy' by Spilling Secrets to WikiLeaks*, Courthouse News Serv. (July 30, 2013), https://perma.cc/LUM5-G5HQ (reporting on, and linking to, verdict in Chelsea Manning court-martial announced that day). For reporters who cover courts, including the military justice system, delivering the news requires prompt access to court documents, including records in court-martial proceedings, absent the government's ability to make a specific showing that access should be restricted or delayed.

### C. Congress enacted a statutory right of access to further ensure public access to military courts.

Not only does the First Amendment require access here, but Congress has expressly recognized the need to facilitate public access to presumptively open military courts and

court records. Specifically, Congress adopted, as part of the Military Justice Act of 2016, Article 140a to ensure public access to court-martial filings, records, and docket information, consistent with access in civilian courts. 10 U.S.C. § 940a(a)(4) (ADD parenthetical). Congress passed the law following years of public outcry concerning reports of widespread sex crimes in the military and lax military adjudications, which led to calls from the public and officials within the military itself for greater transparency through public access. *See* Letter from Reporters Committee and 38 Media Orgs., *supra* note 1.[5] Among other things, the law was expected to shed light on how sexual assault crimes are handled by addressing the "lack of uniform, offense-specific sentencing data from military courts, which makes meaningful comparison and analysis of military and civilian courts 'difficult, if not impossible.'" David A. Schlueter, *Reforming Military Justice: An Analysis of the Military Justice Act of 2016*, 49 St. Mary's L.J. 1, 113 (2017).

Article 140a requires the Secretary of Defense to "prescribe uniform standards and criteria . . . using, insofar as practicable, the best practices of Federal and State courts" to facilitate "public access to docket information, filings, and records, taking into consideration restrictions appropriate to judicial proceedings and military records." 10 U.S.C. § 940a(a)(4) (emphasis added). Significantly, the standards and criteria must facilitate such public access "at all stages of the military justice system . . . including pretrial, trial, post-trial, and appellate processes"—not merely after the conclusion of trial and only in cases of conviction, as the Navy contends. *Id.* This language is consistent with

---

[5] Allegations of sexual misconduct in the military were the subject of news reporting prior to Congress taking action. *See, e.g.*, Emily Crockett, *The War in Congress Over Rape in the Military, Explained*, Vox (June 8, 2016), available at https://www.vox.com/2016/6/8/11874908/mjia-military-sexual-assault-gillibrand-mccaskill; *Sex Crime Coverup: Senators Attack Lack Of Transparency In Military Justice System*, First Amendment Coal. (Dec. 10, 2015), available at https://firstamendmentcoalition.org/2015/12/sex-crime-coverup-senators-attack-lack-of-transparency-in-military-justice-system/; Darren Samuelsohn, *Military Still Secretive On Sex Crimes*, POLITICO (Sept. 25, 2013), available at https://www.politico.com/story/2013/09/military-sexual-assault-transparency-097314.

the view "that, to the extent 'practicable,' trial by court-martial should resemble a criminal trial in a federal district court." *United States v. Valigura*, 54 M.J. 187, 191 (C.A.A.F. 2000).[6] The Navy's invocation of the law to resist disclosure is irreconcilable with the statute's history, purpose and language, and risks further frustrating the legitimate news reporting that Congress sought to facilitate.[7]

## II. The public relies on and benefits from press coverage of the military, and the Navy's fight for secrecy will stymie important news reporting.

Given that "each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490–91 (1975). As a "surrogate[] for the public," *Richmond Newspapers, Inc.*, 448 U.S. at 573, the press may have no weightier responsibility than to report on the military. Some of these stories necessitate access to court records, whether as the focus of the story or to provide context and background facts, for a variety of reporting that sheds light on military institutions and the people at all levels connected to it.

For example, a three-part investigation published by The Gazette in 2013 revealed that the Department of Defense had been steadily charging soldiers with misconduct over

---

[6] Likewise, Article 36 of the Uniform Code of Military Justice authorizes the President to prescribe rules for courts martial that should, "so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts." 10 U.S.C. § 836(a).

[7] The National Institute for Military Justice shared this view in a September 19, 2022 letter to the Department of Defense, in which NIMJ expressed agreement with the letter sent by the Reporters Committee and other media organizations. *See* Letter from Rachel E. VanLandingham, President, Nat'l Inst. of Mil. Just. to Hon. Caroline D. Krass, Gen. Couns., Dep't of Def. (Sept. 19, 2022), available at https://www.nimj.org/uploads/1/3/5/5/135587129/nimj_letter_art_140a_sept_19_2022__1_.pdf (stating "concerns about how Article 140a, UCMJ is being misconstrued as a mandate for secrecy rather than for public access to courts-martial").

minor offenses and dishonorably discharging them as the Army downsized after decades of war. *Other than Honorable*, The Gazette (last visited Jan. 6, 2025), available at https://cdn.csgazette.biz/soldiers/index.html. The Gazette's review of court and administrative documents revealed a "25 percent Army-wide" increase since 2009 in misconduct discharges and furthermore that this "mirror[ed] the rise in wounded" soldiers. *See* Dave Phillips, *Disposable: Surge in Discharges Includes Wounded Soldiers*, The Gazette (May 19, 2013), available at https://cdn.csgazette.biz/soldiers/day1.html. The reporting also revealed that at the eight Army posts housing most of the Army's combat units, "misconduct discharges ha[d] surged 67 percent. All told, more than 76,000 soldiers have been kicked out of the Army since 2006." *Id.* The simultaneous rise of the number of wounded and the misconduct charges had devastating impacts for veterans: Following a dishonorable discharge, a former serviceman is no longer entitled to military benefits, including medical care. *Id.*

The investigation raised the question of whether the military was "using minor misconduct to discharge veterans," to avoid the costs of caring for a generation of soldiers returning from Iraq, Afghanistan and other places around the globe with PTSD and other mental and physical ailments. The Department of Defense denied that there was any attempt to separate from wounded soldiers, but the article reported that it "doesn't take serious misconduct to be discharged and lose a lifetime of benefits," having "found troops cut loose for small offenses that the Army acknowledges can be symptoms of TBI and PTSD." *Id.*

The Gazette reviewed documents from prosecutors that suggested a possible overuse of a mechanism to allow soldiers to avoid court-martials—but which would immediately strip the soldiers of all military benefits. *Id.* The newspaper conducted lengthy and numerous interviews with many soldiers who, following their discharge, had been refused care at VA hospitals for injuries and conditions sustained while in combat. Some eventually ended up in homeless shelters. *Id.* The reporting shed light on both these personal stories and complicated public policy questions that impact the lives of service

members and their families, among others. It also won the Pulitzer Prize for national reporting. *David Phillips of* The Gazette*, Colorado Springs, CO*, The Pulitzer Prizes (last visited Jan. 23, 2025), available at https://www.pulitzer.org/winners/david-philipps. The public might never have known about the struggles of these young former soldiers, and the government's handling of their conduct upon their tours of duty, without this reporting, which predated the enactment of Section 140A and which the reporter primarily had to obtain via public records requests and other shoe leather reporting.

The Gazette is far from alone in its work to cover our country's largest agency and the courts and bureaucracy connected to it. The Navy Times, following an intensive investigation that relied on court records and other documents exposed the participation of Naval officers stationed in Bahrain in a trafficking ring involving Thai sex workers. Geoff Ziezulewicz, *Tinder, Sailor, Hooker, Pimp: The U.S. Navy's Sex Trafficking Scandal in Bahrain*, Mil. Times (June 16, 2020), available at https://www.militarytimes.com/news/your-military/2020/06/16/tinder-sailor-hooker-pimp-the-us-navys-sex-trafficking-scandal-in-bahrain/. The reporting drew attention from members of Congress. *See* Gina Harkins, *Senators Demand 'Immediate Action' After Explosive Report on Navy Sex Trafficking* Scandal, Military.com (July 29, 2020), available at https://www.military.com/daily-news/2020/07/29/senators-demand-immediate-action-after-explosive-report-navy-sex-trafficking-scandal.html. It also led to military prosecutions of service members involved in the scandal. Geoff Ziezulewicz, *Navy Chief Convicted for Bahrain Sex Crimes Loses Court Appeal*, Navy Times (Dec. 9, 2020), available at https://www.navytimes.com/news/your-navy/2020/12/09/navy-chief-convicted-for-bahrain-sex-crimes-loses-court-appeal/. The coverage of this important story continued through the criminal proceedings, which examined why convictions were difficult to obtain despite the nature of the charges. *See* Geoff Ziezulewicz, *Why the Navy Struggled to Convict in Bahrain Sex Crime Cases*, Navy Times (June 16, 2020), available at https://www.navytimes.com/news/your-navy/2020/06/16/why-the-navy-struggled-to-convict-in-bahrain-sex-crime-cases/. Yet the journalist who broke this story has stated, including in a declaration submitted

in connection with this lawsuit, the unnecessary difficulties of obtaining court documents from Navy and its continued unexplained withholding of documents in the Bahrain sex scandal case even now, years later. *See* Decl. of Geoff Ziezulewicz, ECF No. 96 ¶¶ 5, 7–8.

Veteran investigative reporter Carl Prine reported on military courts for decades, including his award-winning *Wounded Warriors* series on the struggles of Iraq and Afghanistan combat veterans, and himself served in the Marine Corps and the Pennsylvania Army National Guard. Prine's coverage of the prosecution of Special Warfare Operator Chief Edward Gallagher, who was accused of stabbing to death a wounded Islamic State prisoner of war during a SEAL Team 7 deployment to Iraq in 2017, among other charges, has provided the public with important information and analysis in this highly debated and politicized case. Carl Prine, *Navy Dismisses More SEAL War Crimes Cases, Removes Controversial Prosecutor*, Navy Times (Aug. 6, 2019), available at https://www.navytimes.com/news/your-navy/2019/08/07/navy-dismisses-more-seal-war-crimes-cases-removes-controversial-prosecutor/. He reported on the alleged missteps made by the government in the Gallagher case and the resulting removal of a lead prosecutor. *Id.* He has also reported extensively on documents and testimony that continue to be discussed as former and incoming President Donald Trump champions Gallagher's cause and appears to challenge the authority of military officials who determined his behavior was criminal and subject to military prosecution. He also testified about the obstacles imposed by the Navy to obtain access to military court proceedings and particularly the records relating to them—obstacle with which many amici are familiar—despite the settled case law allowing for access and now a federal statute to help facilitate that access. *See* Decl. of Carl Prine, ECF No. 97 ¶¶ 6–9.

The military's resistance to facilitating or even permitting the access to which the public is entitled raises the question of how many important stories go untold, because the press is unaware of what information is being withheld. Should the Navy prevail here, and particularly if it continues to rely on its own erroneous policy guidance that public access

does not attach where a court-martial ends in acquittal, the flow of information to the press will be impaired, and it is the public that, unable to receive reporting like the examples referenced herein and countless others, will suffer.

## CONCLUSION

For these reasons, amici respectfully request that the Court grant ProPublica's Motion for Summary Judgment, deny Defendants' Cross-Motion, and that it enjoin Defendants from further violations of ProPublica's constitutional rights through improper denials or delays in access to the court martial documents at issue.

Dated: January 24, 2025

Respectfully submitted,

/s/ Jean-Paul Jassy

Jean-Paul Jassy (SBN #205513)
JASSY VICK CAROLAN LLP
355 S Grand Ave, Ste 2450
Los Angeles, CA 90071
Telephone: 310-870-7048
Facsimile: 310-870-7010
jpjassy@jassyvick.com

*Counsel for Amici Curiae*

LISA ZYCHERMAN
MARA GASSMANN
ABIGAIL SINTIM
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone:
lzycherman@rcfp.org

*Of counsel*