

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PRO PUBLICA, INC.,

Plaintiff,

v.

MAJOR GENERAL DAVID J. BLIGH; JOHN PHELAN; EARL G. MATTHEWS; and PETE HEGSETH,

Defendants.

Case No.: 22-cv-1455-BTM-KSC

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT AND DENYING MOTION TO DISMISS**

**[ECF NOS. 88 & 99]**

This case presents a dispute over the public's right to access filings in naval prosecutions.  Plaintiff Pro Publica, Inc. ("ProPublica"), a nonprofit journalism organization, contends that the Navy systematically denies the public access to filings in court-marital proceedings.  ProPublica argues that the Navy's public access policies are unconstitutional and inconsistent with an act of Congress.

The Government does not dispute that its policies limit public access to filings in court-martial proceedings.  The Government contends that whether its policies are lawful is a "political" question—one unsuitable for courts to decide.  Lack of justiciability aside, the Government contends that its policies are lawful and

necessary in the interest of national security.

## I. BACKGROUND

The Bonhomme Richard, a naval warship, was in port in San Diego in July 2020. The Bonhomme Richard cost over $700 million to build and supported combat operations in Iraq. But for about four days in July 2020, it was engulfed in flames. The damage was significant, and many sailors and civilians were injured. The Navy decommissioned the ship because it was not worth repairing.

In the Government's view, the damage done to the Bonhomme Richard was no accident. The Navy brought charges against Seaman Ryan Mays. A preliminary hearing (an "Article 32 hearing") was held, and the presiding judge recommended that the case not proceed to trial. The case did proceed to a court-martial, however, and Mays was ultimately acquitted. What usually coincides with a noteworthy prosecution, of course, is press coverage, and ProPublica wanted to cover the Mays case.

ProPublica is a nonprofit journalism organization. It has won numerous awards and produced important journalism on the criminal justice system and the Navy. For instance, three ProPublica journalists—Megan Rose, Robert Faturechi, and T. Christian Miller—won a Pulitzer Prize for reporting on, among other things, the collision of two Navy destroyers. An arson trial over a near-billion dollar Navy ship unsurprisingly captured Megan Rose's interest. But her coverage of the Mays case was not so simple.

Megan Rose tried to obtain filings in the Mays case. For instance, Rose learned that the Government was seeking "to exclude from evidence a Navy report documenting widespread safety failures leading up to the fire." (ECF No. 90). Rose wanted to assess whether the Bonhomme Richard was damaged because of the Navy's negligence or whether Mays was guilty of arson. But her requests for court-martial documents were denied by the Navy's Office of the Judge Advocate General. ProPublica's counsel fared no better, and the presiding judge

22-cv-1455-BTM-KSC

in the Mays case ruled that the court lacked the power to order the filings released to ProPublica.

Based on the Government's policies, ProPublica was denied access to filings and papers in the Mays case. In fact, the Navy continues to deny ProPublica access to the full Article 32 hearing report and transcript. Seeking to obtain the *Mays* filings and to prevent the Navy from denying the public access to filings in naval prosecutions, ProPublica brought suit against, in their official capacities, the commanding officer of the Judge Advocate General Corps of the U.S. Navy; the Secretary of the Navy; the General Counsel of the Department of Defense; and the Secretary of Defense.

ProPublica is seeking a declaratory judgment, a permanent injunction, and a writ of mandamus. The parties have moved for summary judgment, and the Government also moves for dismissal under the political question doctrine.

## II. DISCUSSION

### A. The political question doctrine does not apply here.

The political question doctrine is grounded in the fundamental principle that the federal judiciary is tasked with adjudicating only legal—not policy—disputes. *See generally Baker v. Carr*, 369 U.S. 186, 217 (1963) (indicating that the doctrine is "essentially a function of the separation of powers"). Federal courts must not decide "controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *accord Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (explaining that there are cases where "the judicial department has no business entertaining the claim of unlawfulness--because the question is entrusted to one of the political branches or involves no judicially enforceable rights").

The political question doctrine applies to questions (1) committed by constitutional text to an equal branch of government; (2) lacking manageable

judicial standards; (3) requiring a policy determination; (4) requiring a court to express lack of respect to an equal branch of government; (5) where courts must adhere to a political decision already made; and (6) where a court decision would lead to "embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217.

As examples, the Court found a case calling on courts to "to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard" to raise a nonjusticiable political question, *Gilligan v. Morgan*, 413 U.S. 1, 5-12 (1973); and the Court found that the Senate's impeachment method was committed by the Constitution to the Senate and thus raised a nonjusticiable political question, *Nixon v. United States*, 506 U.S. 224 (1993). At the same time, however, the Court has held that the legality of a statute giving Americans born in Jerusalem the ability to list on their passport "Israel" as their place of birth raised a legal question, not a political question. *Zivotofsky v. Clinton*, 566 U.S. 189 (2012).

Here, the Government contends that the first three *Baker* factors apply because (1) the questions in this case should be left to the Executive and Legislative Branches and raise national security concerns; (2) the questions here lack manageable judicial standards; and (3) the questions here require policy determinations.

But the judiciary is the branch best suited to adjudicate constitutional and statutory challenges. *See INS v. Chadha*, 462 U.S. 919, 942 (1983) ("No policy underlying the political question doctrine suggests that Congress or the Executive, or both acting in concert and in compliance with Art. I, can decide the constitutionality of a statute; that is a decision for the courts."). That is of course what federal courts do daily. *See Zivotofsky*, 566 U.S. at 196 (stating that statutory and constitutional interpretation is "a familiar judicial exercise"); *Japan Whaling*, 478 U.S. at 230 ("[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.").

The Constitution separates power between three branches and mandates a system of check and balances.  *Morrison v. Olson*, 487 U.S. 654, 693 (1988) (describing "the system of separated powers and checks and balances established in the Constitution").  That system risks weakening if the Executive and Legislative Branches were the ultimate arbiters of the legality of their actions.  Article III courts serve that function in the usual course of their duties.  If the public has a constitutional or statutory right to access filings in naval prosecutions, that *legal* right would not vanish because the Navy is a military unit of the Executive.  *See Gilligan*, 413 U.S. at 11 ("[W]e neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel."); *see also Chadha*, 462 U.S. at 942 ("[T]he presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine. Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications in the sense urged by Congress.").

Indeed, courts have enforced against the President rulings with national security concerns.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (precluding the President from operating steel mills even where in his view it "was necessary to avert a national catastrophe").  The Ninth Circuit even recently ruled that the statutory legality of the President's decision to nationalize the National Guard does not raise a pure political question.  *Newsom v. Trump*, 141 F.4th 1032, 1039, 1045 (9th Cir. 2025) (per curiam).  The Court would hardly be charting a new course by determining the extent of the public's right to access fillings in naval prosecutions.  But, declining to resolve this dispute could impair fundamental rights.

Application of the political question doctrine to the constitutional questions in this case could potentially endanger all rights in court-martial proceedings.  The

Government's position that the political question doctrine precludes consideration of ProPublica's claims has little to no limiting principle. If the Navy wanted to close to the public all court-martial proceedings, the political question doctrine would certainly not apply—but the Government has not provided adequate reasoning to distinguish that case from this one. At bottom, resolving the questions in this case in ProPublica's favor would not improperly limit power granted by the Constitution to the Executive—but would instead recognize power given by the Constitution to the people.

The Constitution does, without question, grant the President much power and discretion over the Navy. But that power is not unlimited. The extent to which the Constitution or Congress properly limits that power—for the public to access fillings in naval prosecutions—is a legal question for courts and is not committed in the Constitution to Congress or the Executive Branch. The questions in this case fall within the core of a federal court's function "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). The Court will thus answer them.

## B. The questions in this case are not moot but ripe.

After ProPublica filed suit, the parties attempted to amicably resolve the issues. The Government provided ProPublica with limited access to some of the *Mays* filings. And on January 9, 2025, Caroline Krass, the (then) General Counsel of the Department of Defense, issued new standards under Article 140a (the Krass Standards). The Krass Standards provide the public with greater access to filings in naval prosecutions. The Government has also started providing the public advanced notice of Article 32 proceedings.

But those developments do not moot the questions in this case. The "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot." *United*

*States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953).  Voluntary cessation moots a claim only where the party asserting mootness carries the "heavy burden" of showing clearly that the challenged conduct will not reoccur.  *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (citation omitted).

There is insufficient evidence showing that the Government could not, or would not, continue to deny the public access to filings in naval criminal prosecutions.  The voluntary cessation doctrine's heavy burden would hardly be a burden at all if the Government could overcome it simply by changing course and then invoking the doctrine.  Finding mootness in this situation could also risk preventing the resolution of the issues, because every time the Government denied access, it could alter course after a suit is filed and then argue mootness.

The Government asserts that it can continue denying the public access to court-martial filings in all cases ending in acquittals.  (ECF No. 99 at 23).  Furthermore, the Government continues to deny the existence of the rights ProPublica asserts, resulting in a realistic probability that ProPublica will be denied access to court-martial records in the future.  *See* (ECF No. 99).  The issues here are not moot.

## C. The public right of access applies to papers in Article 32 hearings and court-martial proceedings.

The First Amendment generally grants the public the right to attend criminal proceedings and to access the filings in such proceedings.  *See, e.g.*, *Waller v. Georgia*, 467 U.S. 39, 44 (1984) (noting that "the press and public have a qualified First Amendment right to attend a criminal trial"); *Forbes Media LLC v. United States*, 61 F.4th 1072, 1077 (9th Cir. 2023) (explaining that the First Amendment's right of public access "extends to some criminal proceedings" and to certain filings

1  in such proceedings).[1]    Indeed, "throughout its evolution" in Anglo-American

2  history, "the trial has been open to all who cared to observe." *Richmond*

3  *Newspapers v. Virginia*, 448 U.S. 555, 564 (1980).  "Such abiding adherence to

4  the principle of open trials '[reflects] a profound judgment about the way in which

5  law should be enforced and justice administered.'"  *Id.* at 593 (Brennan, J.,

6  concurring) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968)).

7      The scope of the public right of access is determined by a two-part test:

8  courts look first to "experience," that is, whether historically the public was granted

9  the access at issue, and second to "logic," that is, whether the right of access

10  significantly furthers the process at issue.  *See Press-Enterprise Co. v. Superior*

11  *Court*, 478 U.S. 1, 8-9 (1986).  Here, in assessing the public's right to access filings

12  in naval prosecutions, the Court finds *Press-Enterprise* instructive.

13      In that case, the Court held that the public right of access applied to a

14  transcript of a preliminary hearing in a state criminal prosecution.  *Id.* at 10-15.  The

15  right applied, the Court reasoned, because the preliminary hearing was essentially

16  a mini trial: the hearing was open to the public and held before a neutral magistrate,

17  and the accused had the right to appear, to counsel, to present evidence, and to

18  challenge the admission of evidence.  *Id.*    Thus, the Court found the First

19  Amendment test satisfied and the public right of access compelling.  *Id.*

20      Article 32 hearings are strikingly similar.  They are in essence mini trials.

21  Article 32 hearings are held before an impartial officer, ideally a judge advocate,

22  to assess whether there is probable cause and jurisdiction and for a

23

24  _____

25  [1]  Because the Court finds the First Amendment right of access broader or at least

26  coextensive with the common law right of access, the Court will analyze the issues here

    solely under the First Amendment.  *See generally Mesabi Metallics Co. LLC v.*

27  *Cleveland-Cliffs, Inc. (In re ESML Holdings Inc.)*, 135 F.4th 80, 94 (3d Cir. 2025)

    (explaining that the First Amendment right of access "is even more robust" than the

28  common law right of access).

recommendation whether to proceed with the charge(s).  10 U.S.C. § 832(a) & (b); *United States v. Castleman*, 11 M.J. 562, 564 (A.F.C.M.R. 1981) ("Article 32 investigating officers, whose functions are judicial and quasi-judicial, are held to the same standards as military judges in determining impartiality.").  The military courts have repeatedly recognized that Article 32 hearings are presumptively open to the public, even finding the issue "settled."  *United States v. Davis*, 62 M.J. 645, 647 (A.F.C.C.A. 2006) ("It is settled that Article 32 investigations are presumptively public hearings."); *ABC, Inc. v. Powell*, 47 M.J. 363, 365 (C.A.A.F. 1997).  Article 32 hearings must be recorded.  10 U.S.C. § 832(e).  At an Article 32 hearing, the accused has the right to counsel and may cross-examine witnesses and present additional evidence.  10 U.S.C. § 832(d); *United States v. Davis*, 64 M.J. 445, 446-47 (C.A.A.F. 2007) ("The procedures for an Article 32 hearing include representation of the accused by counsel, the right to present evidence, and the right to call and cross-examine witnesses."); *United States v. Miro*, 22 M.J. 509, 511 (A.F.C.M.R. 1986) (explaining that an accused's counsel should have "adequate time to prepare" for an Article 32 hearing).

Because Article 32 hearings are nearly identical to the hearing at issue in *Press-Enterprise*, it would necessarily seem to follow that the right of access found there should apply here as well.  To hold otherwise would require one of two distinctions, neither of which is persuasive.  First, *Press-Enterprise* and the right of public access to filings could be found inapplicable to military courts.  But that holding would be contrary to military court decisions and the very nature of the courts-martial.

After all, courts-martial are criminal proceedings in nature, not a pure military matter, and military courts can try common offenses by servicemembers divorced from military service.  *Ortiz v. United States*, 585 U.S. 427, 437-38 (2018) (describing the "military justice system's essential character" as "judicial," explaining that service members are given virtually identical protections in courts-

martial as in state or federal prosecutions, and noting that service members can be charged in courts-martial with "garden-variety crimes unrelated to military service"); *Solorio v. United States*, 483 U.S. 435, 436 (1987) (rejecting the rule that there must be a "service connection" to a court-martial charge).  The accused in a court-martial is ultimately charged with a crime and could be subject to lifetime incarceration or death, and thus there is little reason to withdraw the public right of access from military proceedings.  *See Ortiz*, 585 U.S. at 438 ("Courts-martial can impose, on top of peculiarly military discipline, terms of imprisonment and capital punishment.").    The First Amendment's experience-and-logic test requires extending to the court-martial the public right of access.

Second, the Court could limit the right of access to testimony by excluding filings, transcripts, and related papers from the right of access.  But such a holding would run counter to *Press-Enterprise*, *Nixon v. Warner Communications*, 435 U.S. 589, 597 (1978) ("[C]ourts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."), and Ninth Circuit precedent recognizing that documents in criminal cases generally fall within the public right of access, *Oregonian Publishing Co. v. United States District Court*, 920 F.2d 1462, 1466 (9th Cir. 1990) ("[T]he press and public have a qualified right of access to plea agreements and related documents under the First Amendment."); *Seattle Times Co. v. United States District Court*, 845 F.2d 1513, 1517 (9th Cir. 1988) ("[T]he press and public have a right of access to pretrial release proceedings and documents filed therein.").

Moreover, distinguishing evidence through live testimony from evidence submitted through exhibits, papers, and related filings would be tenuous at best.  If the press can attend Article 32 proceedings, then any evidence offered there should not be withheld from the press merely because it is offered in documentary form.  The distinction between testimonial evidence and documentary evidence has little basis in the First Amendment's logic test.  *See Courthouse News Serv. v.*

*Planet*, 947 F.3d 581, 592 (9th Cir. 2020) ("Absent a showing that there is a substantial interest in retaining the private nature of a judicial record, once documents have been filed in judicial proceedings, a presumption arises that the public has the right to know the information they contain."); *United States v. Antar*, 38 F.3d 1348, 1360 (3d Cir. 1994) ("It would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed, for what exists of the right of access if it extends only to those who can squeeze through the door?").  After all, as it pertains to the public release of evidence, the Government and the public should have little reason to be more concerned with the *form* that evidence takes in court over the *substance* of the evidence.

Evidence which can be quoted in the press if admitted through witness testimony should not be withheld from the press merely because it is admitted through papers.  In this Court's view, there is no persuasive basis to withdraw the public right of access from Article 32 proceedings nor, as a general matter, from the filings and submissions therein.  It must necessarily follow, of course, that the same right applies in a court-martial.  The closer question, however, is over the scope of the right of access.

**D. The public right of access to papers here is not contemporaneous and is subject to statutory, national security, and other valid exceptions**.

Although essentially criminal trials, court-martial differ significantly from state and federal systems.  Generally stated, courts-martial are comprised of a temporary group of service members who decide a case and then "return to their regular duties."  *See United States v. Denedo*, 556 U.S. 904, 918 (2009) (Roberts, C.J., concurring in part and dissenting in part).  ProPublica claims that any filings in a court-martial should be given contemporaneously to the press.  But this claim mistakes the nature of a court-martial and the need for review before papers are

released for public view.

The members of a court-martial are not necessarily well suited to review filings to determine whether they must be withheld or redacted from public view. The members of a court-martial are not necessarily there to determine whether a filing raises national security concerns or whether its release would violate a statute. Indeed, it may not be readily apparent whether a filing raises national security concerns or whether its release would violate a statute.

Further, "the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon*, 435 U.S. at 598. It should thus be unquestioned that the Government has the right to control filings in Article 32 and court-martial proceedings and determine whether the release of evidence would violate a statute, raise national security concerns, or must be prevented for other valid and compelling reasons. *See Dhiab v. Trump*, 852 F.3d 1087, 1094 (D.C. Cir. 2017) (describing the American tradition of denying public access to national security information); *N.Y. Times Co. v. United States DOJ*, 806 F.3d 682 (2d Cir. 2015) (upholding sealing of classified information); *United States v. Vinas*, No. 08-CR-823 (NGG), 2017 U.S. Dist. LEXIS 86724 (E.D.N.Y. June 6, 2017) (finding after in camera review that portions of a letter should remain redacted for national security concerns); *In re Gabapentin Patent Litig.*, 312 F. Supp. 2d 653, 664 (D.N.J. 2004) ("[T]he public right of access to judicial records does not trump all other interests and may be limited where there are important overriding interests.").

For documentary evidence, transcripts, or related papers and filings from Article 32 and court-martial proceedings, the public right of access is not contemporaneous and is subject to withholding or redaction on statutory bases, for bona fide national security concerns, and for other valid and compelling reasons. The Court finds the release of papers within 30 days of the certification

of the trial record sufficient for the Government to review whether any papers must be redacted or withheld.  Any further delay risks unnecessarily preventing the press from providing the public with newsworthy information in a timely manner.  *See Planet*, 947 F.3d at 594 (recognizing "that a necessary corollary of the right to access is a right to timely access" and describing "the public interest in obtaining news" as "an interest in obtaining contemporaneous news").  The Court does not here question the Government's arguments, *see* Captain Chad Temple's deposition testimony, as to whether any specific documents raise national security concerns, and the Court notes that considerable deference should accorded to the military over such questions.

However, the Court does reject the Government's policy of withdrawing acquitted cases as a class from the public right of access.  Eliminating acquitted cases as a class from the public right of access runs afoul of the First Amendment.  The purported evidence offered to the contrary is speculative, baseless, and inconsistent with the First Amendment.  Indeed, as explained, a naval prosecution ending in an acquittal may have nothing to do with military matters or national security concerns at all.  The Government's arguments are simply overbroad.

The Government relies on *ACLU v. United States DOJ*, 750 F.3d 927 (D.C. Cir. 2014), which held that the DOJ could withhold under the Freedom of Information Act "case names and docket numbers for prosecutions in which the government had obtained cellular phone tracking data without a warrant and the defendant" was acquitted or the case was dismissed.  That case is not binding here, in the Ninth Circuit, and it is distinguishable.  This case raises constitutional questions distinct from the statutory question at issue in the D.C. Circuit case.  In fact, the D.C. Circuit did not even cite *Press-Enterprise*, a key precedent on the issues presented in this case.  In any event, in this Court's view, Judge Brown's dissenting opinion, 750 F.3d at 939-44, is more persuasive than the majority opinion because the public interest in following criminal cases outweighs any

interest in trying to keep private information which is likely already public.

Last, the Court finds that notice of Article 32 proceedings must be reasonably suited to facilitate attendance by interested observers.  Three days' notice would be insufficient to that end.  Considering the preparation that an accused's counsel must undertake, the Government should be able to—and must—provide at least ten days' notice to the public of an Article 32 proceeding.

### E. The Court will not issue a writ of mandamus because the Secretary's duties under Article 140a are imprecise and subject to discretion.

A writ of mandamus may issue where "(1) the plaintiff's claim is 'clear and certain'; (2) the defendant official's duty to act is ministerial, and 'so plainly prescribed as to be free from doubt'; and (3) no other adequate remedy is available." *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994) (quoting *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir. 1986)).   "The extraordinary remedy of mandamus lies within the discretion of the trial court, even if the three elements are satisfied."  *Oregon Natural Resources Council v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995).

Here, the Secretary's duties under Article 140a are imprecise and subject to discretion.  Congress in Article 140a, 10 U.S.C. § 940a, imposed on the Secretary of Defense the duty to "prescribe uniform standards and criteria for" public access to filings in the "military justice system . . . using, insofar as practicable, the best practices of Federal and State courts."  The duties required under Article 140a— the standards which the Secretary must prescribe—are not clearly set forth by Congress.  The Secretary thus has much discretion under Article 140a, and a writ of mandamus would risk the Court excessively overseeing the Secretary's standards.  Moreover, because the Court will grant ProPublica declaratory and equitable relief, a mandamus is not necessary.  *See Barron*, 13 F.3d at 1374 (providing that mandamus is not warranted where other relief is available).

In short, because Article 140a grants the Secretary much discretion, a writ of mandamus should not issue. *See Interstate Commerce Com. v. New York, N. H. & H. R. Co.*, 287 U.S. 178, 204 (1932) ("Where a duty . . . is regarded as involving the character of judgment or discretion . . . mandamus is thereby excluded." (citation omitted)); *Wilbur v. United States*, 281 U.S. 206, 218 (1930) ("[W]here the duty is not thus plainly prescribed but depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus.").

### III. CONCLUSION

For the reasons stated, this case raises legal questions over the public's right to access papers in naval prosecutions. The political question doctrine is thus inapplicable, and the Government's motion to dismiss is **denied**. The Court finds that there are no genuine disputes of material facts precluding summary judgment, and that the parties have waived any argument to the contrary. The Court holds that the public right of access applies to filings, documentary evidence, and related papers in Article 32 hearings and court-martial proceedings. The Government's policies denied ProPublica's First Amendment right of access.

ProPublica is entitled to summary judgment in part on its claim for declaratory relief. 28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (explaining that relief may be granted under the Declaratory Judgment Act where a concrete, legal dispute requires a judicial declaration rather than an advisory opinion for hypothetical facts). ProPublica is also entitled to summary judgment in part on its claim for a permanent injunction. *See Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022) (explaining that a court may issue a permanent injunction where (1) the plaintiff has suffered irreparable injury; (2) remedies at law are inadequate; (3) a balance of the hardships weighs in favor of equitable relief; and (4) equitable relief would aid rather than harm the public interest). ProPublica

is not entitled to a writ of mandamus, and the Government is entitled to summary judgment on ProPublica's Third Count.

Both motions for summary judgment are **granted in part and denied in part**. The Government's evidentiary objections are overruled.  No later than fourteen (14) days following the entry of this order, the parties may submit proposed language for the entry of final judgment.  The parties must appear for a status hearing on September 29, 2025, at 4:30 P.M.

**IT IS SO ORDERED.**

Dated:  September 11, 2025

Honorable Barry Ted Moskowitz
United States District Judge

22-cv-1455-BTM-KSC