1          UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3  PRO PUBLICA, INC.,                )
                                     )  No.  3:22-CV-1455-BTM-KSC
4              Plaintiff,            )
                                     )
5  v.                                )  June 30, 2025
                                     )
6  MAJOR GENERAL DAVID J. BLIGH;     )
   JOHN PHELAN; EARL G. MATTHEWS;    )
7  and PETE HEGSETH,                 )
                                     )  Courtroom 15B
8              Defendants.           )
   _____   )  San Diego, California

9

10            TRANSCRIPT OF PROCEEDINGS

11                (Motion Hearing)

12

13    BEFORE THE HONORABLE BARRY TED MOSKOWITZ, DISTRICT JUDGE

14

15

16

17

18

19

20

21  COURT REPORTER:          AMANDA M. LeGORE
                             RDR, CRR, CRC, FCRR, CACSR
22                           U.S. District Court
                             333 West Broadway, Suite 420
23                           San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov
24
   Reported by Stenotype:  Transcribed by Computer
25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:        MARISSA MULLIGAN
                               Gibson, Dunn & Crutcher
 3                             333 South Grand Avenue, 51st Floor
                               Los Angeles, CA  90071
 4                             (213)229-7240
                               mmulligan@gibsondunn.com
 5

 6                             MATTHEW HALGREN
                               Sheppard Mullin Richter, et al.
 7                             501 West Broadway, 19th Floor
                               San Diego, CA  92101
 8                             (619)338-6684
                               mhalgren@sheppardmullin.com
 9

10
     FOR DEFENDANT BUTLER and
11   CRANDALL JR:              MARY TOMMICILE GLOVER-ROGERS
                               ERIN DIMBLEBY
12                             SAMUEL BETTWY
                               DOJ-USAO
13                             Civil Division
                               888 Front Street, Rm 6293
14                             San Diego, CA  92101
                               (619)546-7643
15                             mary.glover-rogers@usdoj.gov
                               erin.dimbleby@usdoj.gov
16                             samuel.bettwy@usdoj.gov

17   FOR DEFENDANT DEL TORO:   JULIET KEENE
                               Office of the U.S. Attorney (SD)
18                             880 Front Street, Room 6293
                               San Diego, CA  92101
19                             (619)546-6768
                               juliet.keene@usdoj.gov
20

21
     ALSO PRESENT:             ATTORNEY LT. COMMANDER SCHEETZ
22

23

24

25
```

1              (Monday, June 30, 2025; 3:04 p.m.)

2

3                    P R O C E E D I N G S

4

5         THE CLERK:  If we could have the attorneys for the

6    civil matter step forward, please.

7      Please go ahead and have a seat, and I'll call the case and

8    address you.

9      Calling matter number 6 on the calendar, 22-CV-1455, Pro

10   Publica, Incorporated, versus Butler, et al.

11     May I please have the appearances for the plaintiff's side.

12        ATTORNEY MULLIGAN:  Good morning.  Melissa Mulligan,

13   from Gibson Dunn, for plaintiff Pro Publica.

14        ATTORNEY HALGREN:  And Matthew Halgren, Sheppard

15   Mullin, also for Pro Publica

16        ATTORNEY BETTWY:  Good afternoon, your Honor.  Sam

17   Bettwy, with the U.S. Attorney's Office, and I'm also here with

18   co-counsel.

19     Go ahead and introduce yourselves.

20        ATTORNEY KEENE:  Juliet Keene on behalf of the United

21   States.

22        ATTORNEY LT. COMMANDER SCHEETZ:  Lieutenant Commander

23   Breier Scheetz, agency counsel for the Department of the Navy.

24        ATTORNEY DIMBLEBY:  A.U.S.A. Erin Dimbleby on behalf

25   of defendants.

1    ATTORNEY GLOVER:  Mary Cile (phonetic) Glover Rogers

2    on behalf of defendant.

3    THE COURT:  Thank you.

4    The plaintiff has the floor.

5    ATTORNEY MULLIGAN:  Thank you, your Honor.

6    THE COURT:  Hold on.

7    ATTORNEY MULLIGAN:  Can I just briefly ask?  I know

8    that our client, Pro Publica, and a number of individuals are

9    on the conference line.  Is that connected?

10   THE CLERK:  No.  I was not aware there was a phone

11   call.

12   ATTORNEY MULLIGAN:  Oh.

13   ATTORNEY HALGREN:  So I believe the law clerk had

14   provided a dial-in number.  Is that something that can be

15   easily connected?  Or -- if not, then we can just proceed.

16   THE CLERK:  Because I was not notified of this.  So --

17   ATTORNEY MULLIGAN:  No problem.  Thank you.

18   Pro Publica is asking the Court --

19   THE COURT:  Hold on.

20   ATTORNEY MULLIGAN:  -- to grant its motion for summary

21   judgment --

22   THE COURT:  Hold on.

23   ATTORNEY MULLIGAN:  Oh.

24   THE CLERK:  One second.

25   Will the people on the line be addressing the Court as

1   well?  Or just listening in?

2          ATTORNEY MULLIGAN:  They were just planning on

3   listening in.

4          THE CLERK:  One moment.

5          THE COURT:  Yes, we can do that if they call and dial

6   the number.

7          ATTORNEY MULLIGAN:  I believe they are listening to

8   the hold music right now, so they should be --

9          THE CLERK:  Okay.  I'm just waiting.  The law clerk is

10  providing me the number.

11         ATTORNEY MULLIGAN:  All right.  Thank you very much.

12         THE COURT:  One thing that I think needs to be

13  addressed is what are the operable facts that the parties

14  consider as uncontested, upon which summary judgment is being

15  considered.  We should address it at some point.

16      That is what -- is the Navy still refusing to disclose?

17      Do we have them on the line?

18         THE CLERK:  Not yet, sir.

19        (Pause.)

20         THE COURT:  If counsel are more comfortable being

21  seated, you can argue from the table.

22         ATTORNEY MULLIGAN:  Thank you.

23         THE COURT:  Any luck?

24         THE CLERK:  No, your Honor.  I'm still working on it

25  right now.

1        ATTORNEY MULLIGAN:  Your Honor, we certainly don't

2   want to hold anyone up any longer.  We are happy to just

3   proceed, if this isn't working.

4        THE COURT:  Okay.  And they can join us when they can.

5        ATTORNEY MULLIGAN:  Sounds good.  Thank you very much,

6   your Honor.

7        THE COURT:  Go ahead.

8        ATTORNEY MULLIGAN:  Thank you.

9     Pro Publica is asking the Court to grant its motion for

10  summary judgment because defendants continue to violate its

11  First Amendment and common law rights of access to this day.

12  And defendants are also abandoning the duties Congress imposed

13  under Article 140(a).

14     I've heard your Honor's first question regarding what are

15  the uncontested facts and what is the Navy refusing to

16  disclose.

17     Frankly, the Navy is refusing to disclose quite a lot.  We

18  submitted numerous declarations in support of our motion for

19  summary judgment, detailing the many records that we have

20  sought.

21     We sought all of the records in the court martial *United*

22  *States v. Mays.*  We got a small portion of those records, and

23  the ones we did get were completely redacted or redacted at

24  great length.

25     We also submitted declarations from reporter Megan Rose,

1  who detailed that she sought court martial records in three

2  homicide cases, 91 cases of rape, sexual assaults, and other

3  sexual misconduct charges.  She also sought records in an

4  unknown number of additional sexual assault cases about which

5  she just simply does not have enough information to even detail

6  what they were about or when they occurred.

7      These are just a handful of examples of records that we are

8  unable to get.  And this is not a practice that has stopped.

9  It is something that is continuing, and we can see that in

10  Ms. Rose's supplemental declaration that she submitted in

11  connection with our reply.  This is a practice the defendants

12  have of not providing adequate notice of Article 32 hearings,

13  and not providing complete and contemporaneous access to court

14  martial records.  And we should not have to come to court every

15  time we seek access to a particular record or notice of a

16  particular hearing.  This is a continuing violation of Pro

17  Publica's First Amendment rights.  And that is why we're

18  seeking a declaration that Pro Publica's First Amendment and

19  common law rights of access apply to these at-issue military

20  proceedings and records.  And we're seeking a permanent

21  injunction to stop defendants from violating those rights in

22  ways I will detail momentarily.  And we're also seeking a writ

23  of mandamus, requiring the Secretary of Defense to comply with

24  Article 140(a).

25      Now, I know your Honor has the benefit of our briefing and

1    so I won't go into every detail but, if you will indulge me, I

2    would like to briefly hit upon some of the salient points.

3        So I want to be very clear because it's a primary argument

4    in defendants' initial -- what they call their motion to

5    dismiss, the motion to dismiss portion of their motion for

6    summary judgment.  The political question doctrine in no way

7    precludes the Court from adjudicating this dispute.  Whether or

8    not judicial proceedings are properly closed and judicial

9    records properly sealed is not a, quote/unquote, military

10   matter.  This involves questions of constitutional laws, common

11   law, and statutory interpretation; plainly within this Court's

12   purview.

13       Defendants argue that acting here would be an interference

14   with, quote, interbranch decision making because there's a

15   process by which something called the military justice review

16   panel conducts a review and reports its findings to the

17   committee on the armed services.  Then that committee can

18   recommend further recommendations to amend Article 140(a).

19       But there's three brief points I want to make in response

20   to that.  First, courts routinely analyze individuals' First

21   Amendment rights, as your Honor well knows.

22       Second, they also determine whether statutes are being

23   complied with.  It doesn't matter that Congress promulgated

24   those statutes in the first place, or that they have the

25   ability to revise them in the future.  That's just how our

1    system works.

2        Finally, and perhaps most interestingly, it's our

3    understanding that since the time the parties briefed this

4    motion, everyone has actually been let go from the military

5    justice review panel.

6        And so the body defendants are relying on for their

7    interbranch decision making argument seems to not --

8    essentially not even exist anymore.

9        The Supreme Court held conclusively, in *Oritz versus the*

10   *United States*, that the military justice system's essential

11   character is judicial.

12       Courts have rejected similar arguments by the Department of

13   Defense to evade judicial review in First Amendment cases.

14   Both in the *Nation Magazine* case and the *Flint* case were clear

15   that courts have the ability to review military regulations

16   affecting press coverage and press access.

17       Pro Publica is entitled to declaratory relief because it

18   is -- there's no question that the First Amendment right of

19   access applies here and the Navy is violating those rights.

20       To determine if the First Amendment right of access

21   applies, courts apply the experience and logic test.  The first

22   question asked is whether the proceeding has, quote,

23   historically been open to the public and the press.  The second

24   question is whether the public access plays a significant,

25   positive role in the functioning of the particular process in

1    question.

2         With respect to the first element, I know courts martial

3    are not Article III courts.  But this prong looks to, quote:

4    "The experience and the type or kind of proceeding throughout

5    the United States."  That's the *El Vocero de Puerto Rico* case

6    in the Supreme Court.

7         It's the type or kind of proceeding that's really important

8    here.  And it's something that defendants do not focus on in

9    their briefing.

10        The defendants here, and in other cases, cannot simply

11   point to the exact record they're talking about or the exact

12   proceeding being disputed and say, "Well, I've never made it

13   public, so I shouldn't have to now."  That would allow them to

14   evade this type of review.  It's the type or kind of proceeding

15   in the United States.  That's what we're talking about here.

16        In any event, courts martial have also historically been

17   open, and openness is embedded in the military rules

18   themselves.

19        The rules have long provided that preliminary hearings are

20   public proceedings and should remain open to the public

21   whenever possible.

22        As to the second prong, which looks at the -- that public

23   access plays a positive role in the functioning of the

24   particular process in question, there is no question that

25   openness enhances public confidence in the system.

1       The press, including Pro Publica, function as a surrogate

2   of the public in their reporting.  That's the *Richmond*

3   *Newspapers* case in the Supreme Court.

4       The defendants say that this could actually just be quite

5   negative to give this amount of information and access, and it

6   could get into the wrong hands.  But there's just no evidence

7   or case law to support that view.  Without access, the public

8   does not know what is happening in courts martial, and there is

9   a pervasive lack of distrust [sic] in the system, and there is

10  an inability to ensure fair outcomes.

11      I want to be very clear that this right of access also

12  applies to documents.  The Ninth Circuit and courts nationally

13  have long presumed a First Amendment right of access, not only

14  to proceedings but also to the related documents to those

15  proceedings.

16      I want to be very clear that delayed access just doesn't

17  cut it.  I understand defendants might say, "Well, we do

18  provide access to some records.  It just takes a bit of time.

19  We need time to go over them.  We need time to apply

20  redactions."  That doesn't satisfy the First Amendment.

21      Courts have routinely found that the effect of delay is a

22  total restraint on the public's First Amendment right of

23  access, even if a restraint is limited in time.

24      And once it's clear that this First Amendment right of

25  access applies, which it clearly does, it's actually

1    defendants' burden.

2        It's defendants' burden to show that their restrictions are

3    justified.  They have to show that -- that the restrictions

4    further are compelling government interests, that they're

5    narrowly tailored to further that interest, and that there's no

6    less-restrictive means available.

7        They have to do this as to every record or hearing they are

8    sealing, not on a broad scale and not presumptively.  That's

9    why we're here today, and it's something that the defendants do

10   not seem to understand.

11       They have to satisfy this compelling interest test with

12   respect to every document and every proceeding they are trying

13   to seal.  They can't come here today and say, "Well, we will

14   always have national security interests, and so we always need

15   to withhold records."  That just doesn't cut it.

16       Defendants assert many reasons that they say are compelling

17   government interests.  They cite the Privacy Act, they cite

18   FOIA exemptions, they cite burden, national security, unit

19   cohesion.  I'm not going to get into each of them now.  I can,

20   if your Honor has particular questions.  But, again, I know you

21   have the benefit of our briefing.

22       But what I will say is that not a single one of those

23   arguments were made with -- with respect to particular records

24   or particular proceedings.  And so those arguments just simply

25   miss the mark.  They're not even applying the right analysis.

1    Because Pro Publica's First Amendment rights of access

2    clearly apply and have been violated, a permanent injunction

3    should issue here, requiring the defendants to immediately

4    release all court records in the *Mays* case; and to provide

5    adequate Article 32 hearing notice, and contemporaneous access

6    to all military judicial proceedings and records in the future.

7        As your Honor well knows, a permanent injunction is proper

8    where the moving party can demonstrate actual success on the

9    merits, which I just detailed; irreparable harm, absent the

10   injunction; the balance of the equities tips in plaintiff's

11   favor; and injunctive relief in the public interest.

12       There will undoubtedly be irreparable harm without an

13   injunction here.

14           THE COURT REPORTER:  I'm sorry.  I need you to speak

15   slower and repeat the case cite, please.

16           ATTORNEY MULLIGAN:  The *Elrod versus Burns* case was

17   clear that the loss of First Amendment freedoms for even

18   minimal periods of time constitutes irreparable injury.

19       Without advance notice of hearings or contemporaneous

20   access to records, Pro Publica reporters simply cannot do their

21   job.  They cannot report on mysterious crimes being adjudicated

22   or, frankly, not pursued at all by the Navy.

23       Here, the balance of the equities and the public interests

24   clearly favor Pro Publica, as well.  The public is entitled to

25   know what is going on here.  Military proceedings resolve

1    matters of extraordinary importance and concern to the public.

2    Sentences can result in life in prison or even death.  And in

3    other cases, while serious crimes might be being committed, the

4    Navy might choose not to pursue those prosecutions at all, and

5    simply allow service members to administratively separate

6    instead.

7        You don't have to take my word for it.  We submitted

8    multiple declarations.  I think eight declarations from various

9    reporters, who speak about how an injunction would certainly be

10   in the public interests.  And that's expressly a prong that

11   should be considered by this Court.

12       There is also a declaration from Don Christensen, who is a

13   victim's rights advocate, including for individuals in the

14   Navy.  And he makes clear that an injunction would absolutely

15   be in the public interest.

16       Finally, a writ of mandamus should issue requiring the

17   Secretary of Defense to issue the uniform standards mandated by

18   Article 140(a).  Mandamus is appropriate where the individual's

19   claim is clear and certain; the official's duty is not

20   discretionary, ministerial, and so plainly prescribed as to be

21   free from doubt; and no other adequate remedy is available.

22       There's no question that this claim is clear and certain.

23   Article 140(a) provides that the Secretary of Defense shall

24   prescribe uniform standards and criteria of conduct.  The

25   standards required are unambiguous, and the failure to observe

1    them is a clear violation.

2         This Court, as your Honor knows, previously recognized that

3    Pro Publica plausibly alleged the Secretary clearly failed to

4    issue sufficient standards, and nothing has changed rendering

5    that claim less clear in the meantime.

6         Article 140(a) not only creates this duty, but it creates

7    guidelines around that duty.  It has no less than three

8    guidelines.

9         The standards must be uniform.  They must facilitate public

10   access at all stages of the military justice system.  And they

11   must follow the best practices of civilian courts insofar as

12   practicable.

13        Now, I understand defendants seized on that "insofar as

14   practicable" language.  And they say, "Well, that's

15   discretionary.  So this clearly isn't nondiscretionary and it's

16   clearly not ministerial."

17        Well, that's just not true.  The *Knuckles versus Weinberger*

18   case in the Ninth Circuit was very clear that a need for any

19   statutory construction or interpretation does not preclude

20   mandamus.

21        And the *Haeuser* case, also in the Ninth Circuit, was clear

22   that where a statute requires someone to make a decision as far

23   as practicable, that also does not preclude mandamus.

24        Even if the past guidance could satisfy the Secretary's

25   duty to prescribe standards, it doesn't meet any of the

1    guidelines I just went through here.  There are no uniform

2    standards.  They don't facilitate access at all stages of the

3    military justice system, and they certainly do not follow the

4    best practices of civilian courts.  That military justice

5    review panel, that defendants repeatedly point to, found that

6    as well.

7        And I will note that since we filed our briefing, that

8    report has been removed from the website.  So I do have copies

9    for your Honor, if you wish.

10       Finally, no other adequate remedy would be available here.

11   While Pro Publica does have its First Amendment and common law

12   claims and that could succeed in getting Pro Publica access to

13   Article 32 hearing notices and records in the *Mays* case and

14   other cases, absent mandamus relief there will be no uniform

15   structure across the armed services, which is the intent of

16   Article 140(a) and is what it requires.

17       Thank you, your Honor.

18           ATTORNEY BETTWY:  Thank you, your Honor.

19       By the way, I'm probably retiring in October, so this might

20   be my last appearance, and I'm glad it's before you, your

21   Honor, after so many years:  1989.

22       Well, I want to start off by addressing the justiciability

23   question.  And this -- this case is not justiciable.  It's

24   constitutionally committed to both executive and congressional

25   authority -- vast authority over military -- over the military.

1    Article I, Section 8, clauses 12 to 14, Congress' Congressional
2    power, which is broad and sweeping; and executive power under
3    Article II, Section 2, clause 1.
4        Pro Publica is asking this Court to up-end 235 years of
5    discretionary authority that the military has exercised over
6    the structure and the management of its military justice
7    system.  And it's asking this Court to be the first ever -- it
8    would be the first ever civilian court to intervene in an
9    ongoing executive legislative branch process.  And not just --
10   and more than that, a process that concerns a uniquely military
11   matter, and a uniquely military matter that implicates national
12   security.  This is an extraordinary ask of this case.
13       Any one of those three would be enough to find that this
14   Court -- that this case is nonjusticiable or that there should
15   be extreme deference, but this -- this case concerns all three
16   combined.
17       And Pro Publica is well aware of that ongoing interbranch
18   process because it has participated in it.  It had -- it made a
19   presentation to the statutorily created military justice review
20   panel, also known as MJRP.  They -- they made a presentation to
21   that panel, to weigh in on the process.  So they know there's a
22   separate interbranch executive congressional process.
23       And MJRP is only one small part of that, and we
24   certainly -- the Government's never relied on it.  It's been
25   Pro Publica which has asked the Court to look at the MJRP

1    report and rely on it as some sort of a blueprint.  MJRP is

2    just one -- one small piece of that interbranch cooperation

3    process.  It's been reporting requirements to the -- to the

4    Senate and the House Armed Services Committees; not just from

5    M -- MJRP is just one of those reports.  And it's all been part

6    of this process.

7        The military justice system, as a whole, can't start

8    carving out pieces of it.  The military justice system operates

9    separately from the civilian system for a reason.

10       Military justice, which includes the substantive law, the

11   procedural law, and the case management system, all exist and

12   are designed to maintain the good order and discipline of a

13   separate military society.

14       Pro Publica wants to conflate civilian and military worlds.

15   They're not.  They can't be conflated.  And any of us who have

16   served understand that; understand that good order and

17   discipline of the military is essential to the military, the

18   military mission, and which is essential to national security.

19       And I would say -- and, in particular, a case management

20   system of court martial records that exist today is based on

21   sound, interrelated policies to protect privacy, presumption of

22   innocence, good order and discipline of the military; all of

23   which implicate national security.  And we've briefed that, how

24   that is.

25       Pro Publica tries to trivialize the national security

19

1    implications.  In fact, they didn't even talk about them at all

2    up here today; the national security implications of what

3    they're asking for.

4        But I would like to read, briefly -- I think I mentioned it

5    in the briefing.  But the first -- the first sentence of the

6    MJRP report, a report that Pro Publica wants this Court to

7    consider with respect to its views on what should be done right

8    away -- okay, MJRP, first sentence.

9            "The challenges of national security demand a

10           separate and strong military justice system."

11       I -- I could go on.  I mean, everything is in that first

12   paragraph of the -- of the over-- the executive summary, which

13   stresses the importance of national security.

14       And I will -- I will repeat this.  It says:

15           "The MJRP recognizes both the profound impact of

16           the many changes to military law and the potential

17           risk to national security of seeking to replicate

18           the practices of civilian criminal justice in the

19           armed forces."

20       This is -- this is nothing to be trivialized.  And, so far,

21   Pro Publica has had nothing to say about that, about

22   national -- that's what this -- a lot of this is about.  I

23   would say most importantly --

24           THE COURT:  Can the public attend an Article 32

25   preliminary hearing in a court martial?

1          ATTORNEY BETTWY:  What's the difference between the

2     two?

3       I'm sorry.

4          THE COURT:  Can the public attend an Article 32

5     preliminary hearing in a court martial?

6          ATTORNEY BETTWY:  Yes, they can, your Honor.  Yes,

7     they can.  And --

8          THE COURT:  Hold on.  So if they can attend and hear

9     the witnesses, why can't they have a transcript and access to

10    the exhibits that are not sealed?

11         ATTORNEY BETTWY:  Okay.  That's -- that's an important

12    question.  And that's a policy.  Of course, that's a policy and

13    procedure of the military.  There are -- there are some huge

14    reasons.

15      One of them is the Privacy Act.  The military is subject to

16    the Privacy Act.  And there are also several statutes that

17    require exclusion of classified and other sensitive material.

18      There has to be a review for -- a centralized review for

19    any sensitive information.  Okay.  That's one reason why it

20    can't be contemporaneous.

21      And then, second of all, a big reason is this policy.  The

22    policy of the military not to release, proactively and

23    automatically, a record of trial until there's been a finding

24    of guilt.

25      But in -- during the trial, during the trial, the news

1   media and the public can request -- they have to do it by

2   request.  It's not done proactively and automatically.  But

3   they can request court records during -- during the trial.

4       But transcripts are not -- well, they're not automatically

5   produced, just the way they're not automatically produced in

6   this court.  Exhibits are not put on -- on Pacer in this court

7   either.

8       But as far as motions, you know, witness -- motions,

9   that -- that would be --

10          THE COURT:  Is there a review before a witness

11  testifies?

12          ATTORNEY BETTWY:  I'm sorry?

13          THE COURT:  Is there a review before a witness

14  testifies?

15          ATTORNEY BETTWY:  No, your Honor.  No.  So there --

16          THE COURT:  Hold on.

17          ATTORNEY BETTWY:  Yes.

18      (Pause.)

19          THE COURT:  So if the public can hear it and repeat

20  it, how can the Navy say it could affect national security?

21  Isn't the appropriate procedure to order that which implicates

22  national security be sealed?

23      By the way, the press can order a transcript and have

24  access to exhibits and our proceedings; that is, unless they

25  are sealed.

1        ATTORNEY BETTWY:  Okay.  So it would be by request.

2   It wouldn't be something automatically and contemporaneously

3   published on an online system.  Those kinds of requests can be

4   made in the military as well, but through the -- through the

5   public affairs office.  They can make those requests as well.

6   But it will be -- there will be considerations of privacy and

7   national security.

8        This Court doesn't -- isn't bound by the Privacy Act, and

9   doesn't have national security statutes.  It relies on the

10  parties to -- to enforce those or to protect those.

11       I would point out that your Honor, while I was waiting

12  here, I heard the -- your Honor mention PSRs.  Those are

13  mentioned.  Those are talked about in court, but they're not

14  published online.  And there's a reason, I assume, for that.

15  Just because something is talked about in court doesn't mean

16  that that -- that means it automatically has to be published

17  contemporaneous -- contemporaneously to the public.

18       And -- and what a witness says on the stand is -- if

19  there's no -- as your Honor pointed out, there's no review of

20  that before the testimony.  All the more reason why there

21  should be concern about that being released contemporaneously.

22  That it should be reviewed before -- any transcript should be

23  reviewed before it's released.

24       But, of course, what happens in the courtroom and what's

25  talked about there -- especially on a secure installation,

1    where a -- there's a lot of control about who can be there,

2    it's a lot different than just releasing everything online

3    contemporaneously.  And those are the concerns that the

4    military has, that are different than the civilian have -- the

5    civilian world has.

6        It's under review.  I'm going to keep -- I want to keep

7    mentioning that all of this is under review in -- in a branch

8    executive, congressional process.  This is all -- all of this

9    is being reviewed, and it's under consideration.  It's -- but

10   it's not something for the judiciary to intervene in, in that

11   process of deciding how much can be released without

12   compromising national security.

13       And, of course, I say "privacy," "the presumption of

14   innocence," all -- those are also taken into consideration.

15   They're not taken into consideration on the civilian side,

16   about whether -- whether records of trial should be released

17   when there's an acquittal.  We don't have something like that,

18   comparable like that.

19       But these are solid policies.  These are solid policies.

20   And they're all aimed at protecting unit cohesion, privacy,

21   presumption of innocence, and all -- all -- it all relates to

22   military good order and discipline, which implicates national

23   security.  It's all interrelated.

24       In fact, I -- I did quote -- I did cite the ACLU case.

25   That ACLU case, of course, was a FOIA case.  And ACLU was

1    seeking release of trial -- criminal trial records.  Of course,

2    all of those trials had been public, but now they wanted the

3    D.O.J. to produce records of these criminal proceedings.  And

4    the Department of Justice said no because of concerns of

5    privacy.  And the ACL -- ACLU agreed.

6        And they talk about the presumption of innocence and

7    privacy.  And the D.O.J. said they were not going to release

8    those records in cases that ended in acquittal.  And the D.C.

9    Circuit agreed.  That that was a reasonable policy.

10       That's -- that's a big part.  And I think your Honor

11   mentioned it in your Honor's order, that that was something of

12   particular concern about that policy.  Because these other

13   policies of -- the Privacy Act applies, national -- national

14   security statutes, review necessary -- okay, that would delay.

15   That would delay the release.  But that's not -- that's not --

16   those aren't the only two pieces.

17       The other is the strong policy of not releasing the record

18   of trial automatically until there's been a finding of guilty.

19   Again, it doesn't preclude requests that can be made pending --

20   pending the trial.

21       (Pause, referring.)

22           ATTORNEY BETTWY:  I -- I don't want to just stand up

23   here and repeat what's in our briefs.  And I would rather, you

24   know, address matters of particular concern of your Honor.

25       I don't think -- I'll just say, as far as the mandamus

1    relief, clearly this is not a statute that was designed for

2    enforcement by the pub -- by a private party.

3         This statute was written by the D.O.J. general counsel.

4    This entire -- the timeline of events in this case started with

5    the Department of Defense approaching Congress to establish

6    this process.  And why?  Because this is a military matter.  It

7    concerns both congressional and executive power over the --

8    over military matters.  So that's why we have an interbranch

9    process.

10        So, clearly, 140(a) was written -- wasn't written for

11   private right of action.  And the standards -- I think, Pro

12   Publica is tending to gloss over what is written in there.  It

13   talks about best standards.  It talks about what's practicable.

14   It talks about what's appropriate for military records.

15   That -- I didn't hear that mentioned up here.  That's a big one

16   in that statute, what's appropriate for military records.

17        So Congress and D.O.D. recognize that there's a -- it's

18   different when it comes to military records and military

19   justice system.  Can't just conflate the military and the

20   civilian.

21        I'll just say quick -- quickly about the *Mays* -- your Honor

22   asked about refusing to disclose.  We did produce a *Vaughn*

23   Index in this -- in this case, your Honor.  And gave all of the

24   reasons why things weren't disclosed.

25        Some of them are law enforcement -- have something -- have

1  some -- let me see (pause, referring).  Asking for reports of

2  investigation.  The -- the reasons given are largely for law

3  enforcement reasons.  Also privacy.  But we haven't briefed

4  that.  I don't think -- I didn't know that's why we're here

5  today, is to get done with the nitty-gritty of the *Vaughn*

6  Index.  I haven't seen any -- any briefing on those particular

7  privileges or reasons for redactions that were asserted.

8      Plus, Captain Temple, our nonretained expert in this case,

9  gave testimony in deposition.

10     And he was -- he was asked, by Pro Publica, can -- can

11 Mays -- former Seaman Mays, release -- release the records

12 himself?  And he said, "Sure he can.  He's not subject to the

13 Privacy Act."  But the military is subject to the Privacy Act.

14     Let me see.  Uncontested facts.  Your Honor asked what are

15 the uncontested facts.

16     I think the timeline of events is an important -- again,

17 I -- the fact that this is an interbranch process and the fact

18 that the ball has been moving forward with several iterations

19 by the general counsel, D.O.D., the ball has been moving

20 forward with getting greater and greater access.  We have --

21 our most recent, 2025 D.O.D. general counsel directive, has --

22 you know, has even more matter matters of disclosure.  So the

23 ball is moving forward.  We've had reporting to Congress.

24 We've had feasibility reports through Congress.

25     Something else I want to mention about that.

1     (Pause, referring.)

2          ATTORNEY BETTWY:  Yeah, D.O.D. even proposed, in 2020,

3     they -- more than once, they proposed to Congress legislation

4     that would state that the Privacy Act doesn't apply.

5     And it passed the Senate but not the house.  The House

6     said, no, we're not going to do that.  We're not ready to do

7     that.  We're not ready to say the Privacy Act doesn't apply.

8     But D.O.D. was -- made that proposal.

9     So any suggestion that there's some attempt here to hide

10    the ball, this -- this whole scheme was created -- this

11    legislative scheme was created in cooperation between D.O.D.

12    and Congress, according to their constitutional authorities and

13    responsibilities.  And it's an ongoing process.

14         THE COURT:  But how long should the review take?

15    Certainly it shouldn't take so long that it is no longer in the

16    public interest.

17         ATTORNEY BETTWY:  Well, that seems to be what -- what

18    Pro Publica is concerned about, is convenience.  It's less

19    convenient to make a request for a document -- for documents.

20    And that it's not -- and newsworthiness.  That -- so we're

21    weighing newsworthiness versus national security.  Well, I

22    would say national security wins.

23         (Pause.)

24         THE COURT:  Any other argument for the Navy?

25         ATTORNEY BETTWY:  (Pause, referring.)  Oh, just I'm

1    reminded here that in *Mays* -- in the *Mays* court martial, the

2    Navy did release the transcript of the Article 32 hearing with

3    redactions.

4        Is that it?  (Speaking to co-counsel.)

5            ATTORNEY BETTWY:  That's all I wanted to add.

6        Thank you, your Honor.  I appreciate it.

7            ATTORNEY MULLIGAN:  Your Honor, if I may be heard

8    briefly?

9        Thank you.

10       A few points I want to respond to.  So I understand

11   defendants' counsel mentioned that this would be the first ever

12   civilian court to weigh in on a matter like this.  That's just

13   not true.

14       When I was up here, I mentioned the *Nation Magazine* and the

15   *Flint* cases, where the courts rejected arguments by the

16   Department of Defense that they couldn't review military

17   guidelines when it came to press access and -- and access to

18   the battlefield.

19       It's also just not true that we are asking this Court to

20   weigh in on anything internal to the military.  We're not

21   asking this Court to tell defendants exactly how to post the

22   records.  We are just asking this Court to adjudicate our First

23   Amendment rights.  This is the only place where we can go to do

24   that.

25           And I want to flag that in the *Mays* case, Pro Publica went

1    to the court martial and asked for access to those records.

2    And you know what the court martial said?  You need to go to an

3    Article III court.  And so here we are.

4        And this is the place to have this issue adjudicated.  And

5    the only reason that there is arguably a lack of decisions in

6    this area in civilian courts is because the jurisdiction of the

7    court martials has changed recently.  It used to be that

8    military appellate courts had jurisdiction over third parties.

9    Now they don't.

10       But, previously, there were a number of cases:  The *A.B.C.*

11   *Inc.* case, *U.S. v. Hershey*, *U.S. v. Travers*, those are all

12   cases that were very clear that the First Amendment right of

13   access applies to court martial proceedings.

14       With regard to Article 32 hearing transcripts, we have

15   asked for access to those transcripts in numerous cases.  We

16   don't get them.  We have not gotten any Article 32 hearing

17   transcripts, except ones with extremely heavy redactions in the

18   *Mays* case; and that only happened after we filed this

19   litigation.  We got the *Vaughn* Index after we filed this

20   litigation.

21       And I heard defendants say that we just didn't brief the

22   issues in that *Vaughn* Index.  Well, that's just not true.  We

23   have extensive briefing on every single issue raised in the

24   *Vaughn* Index, and why it is not a compelling government

25   interest.  And I'll briefly mention some of those, since I

1    heard defendants' counsel mention them today.

2        The Privacy Act is not a compelling government interest

3    here.  The Privacy Act provides no basis for redacting names of

4    third parties in these court martial records.  They testify in

5    open court a lot of the time.  Anyone can go and listen to

6    these people testify in open court.  There is no reason their

7    names need to be redacted in the records.

8        The Privacy Act also doesn't apply to third parties whose

9    names are referenced in court records because the records

10   aren't retrievable by those third party's names.

11       And that's all the Privacy Act applies to.  The *Baker*

12   *versus Department of Navy* case in the Ninth Circuit was very

13   clear about that.  It says:

14           "The Privacy Act does not apply to a report"

15           retrievable -- "not retrieve under that party's

16           name."

17           And so it doesn't even apply.  But defendants are

18   simply wrong by saying that Congress has made some

19   pronouncement that the Privacy Act does apply here because it

20   didn't state some amendment that said it doesn't apply.

21       Well, we can't presume to know why Congress did not pass

22   that amendment.  They might have already thought it was very

23   clear that it didn't apply.

24       And there's already a routine use exemption under the

25   Privacy Act that makes it clear that these records are not

1    subject to the Privacy Act -- which I'll talk about in a

2    moment.

3        But an ambiguous amendment in legislative history is not

4    sufficient to overcome the First Amendment.  It just makes no

5    sense that Congress thinks the Privacy Act applies here and

6    simultaneously enacted Article 140(a), requiring the release of

7    court records.  It would render it meaningless.

8        Even if the Privacy Act does apply -- and it doesn't --

9    everything here falls under the routine use exemptions to the

10   Privacy Act.  Those permit disclosure of records for a purpose

11   which is compatible with the purpose for which the information

12   was collected.  The military itself has acknowledged this.

13       In 2021 the Department of Defense published a system of

14   records notice in the Federal Register, confirming the routine

15   use exemption authorizes the military to release records to the

16   general public.  It specifically lists pleadings, exhibits,

17   evidence, trial transcripts, records, and filings.

18       The MJRP, that independent task force we've been talking

19   about, similarly confirmed that there's a routine use exemption

20   to the Privacy Act that these records would fall under.

21       I heard counsel talk about assertions of administrative

22   burden and feasibility reports.  Defendants say they simply

23   don't have the resources to compile case-specific dockets, keep

24   them updated, or otherwise release records while cases are

25   ongoing.  But this is a completely self-serving argument, and

1    it implies we're asking for much more than we are.  We are not

2    asking defendants to implement Pacer.

3        We are just asking for contemporaneous access to records,

4    however that needs to happen.  This is our First Amendment

5    right.

6        Civilian criminal courts give the public advance notice of

7    their proceedings and make records publicly available, even

8    when they need to apply redactions; all the time.  As this

9    Court knows, those courts oversee thousands of cases a year.

10       The Navy's claim that they can't provide the same access to

11   a small number of court martials with their

12   multi-billion-dollar budget, with their 1,000-plus legal staff

13   is, frankly, absurd.

14       The congressional report last year, which we cited in our

15   briefing, states that there were around 60 general courts

16   martial last year; in a year.  And maybe 150 courts martial

17   generally, when you take into account special courts martial.

18   There's just no reason this can't be done from a feasibility

19   perspective.  It's just not true.

20       Also, the military commissions do this all the time, and so

21   we know it's possible.  It really is not that difficult.

22       I heard counsel say that we are trivialize -- trivializing

23   national security and unit cohesion.  Again, that's just not

24   true.

25       With respect to national security, Pro Publica is not here

1   asking for the nuclear codes.  We just want contemporaneous

2   access to records from proceedings that are already open.  As

3   your Honor noted, anyone can go listen to these hearings.

4   There's no reason that the records related to those proceedings

5   need to be kept private for national security purposes.

6       The military commissions, again, manage to do this, and

7   they deal with far more national security concerns than the

8   courts martial we're talking about here.

9       I also want to flag that we are not saying national

10  security concerns are relevant.  We understand that in

11  particular cases there might be national security concerns.

12  But is -- that's the reason that defendants need to argue this

13  on a case-by-case basis.  It can't be that they have a policy

14  of withholding records for 45 days after the record on appeal

15  is certified, which might not happen for months after a case is

16  finished, because they want to review it for national security.

17  That can't be their policy.  That doesn't comply with the First

18  Amendment.  That just doesn't work.

19      And the *United States versus Grunden* case was very clear

20  about that.  It said, "You can't just use terms like

21  'security,' or 'military necessity,' and expect the guarantees

22  of public trials to vanish."  You can't do that.  You have to

23  argue on a document-by-document, proceeding-by-proceeding

24  basis.

25      There were a number of points made about presumption of

1    innocence.  And, you know, we can't release records because

2    there's a presumption of innocence.  And I know counsel

3    mentioned an ACLU case, which he did mention was a FOIA case.

4    That was a FOIA case.  It didn't deal with the First Amendment

5    at all.  It's totally inapplicable here.  It didn't go under

6    the First Amendment strict scrutiny standards.  And that's just

7    not what we're talking about here.

8        Finally, there is no requirement for a private right of

9    action when it comes to a writ of mandamus.

10        Defendants claim Pro Publica has no private right of

11    action, and so it simply cannot seek a writ of mandamus with

12    respect to Article 140(a).  The case law is very clear that

13    that is not required.  The *Legal Aid Society versus Brennan*

14    case in the Ninth Circuit and the *Freedom Watch* cases versus --

15    *Freedom Watch versus Obama* case, in the District of D.C., were

16    both very clear that you can get mandamus relief even when an

17    underlying statute does not contain a private right of action.

18        Thank you.

19            THE COURT:  I am still wondering what the undisputed

20    facts are upon which you want summary judgment.

21            ATTORNEY MULLIGAN:  So the undisputed facts are that

22    we have not -- we don't receive contemporaneous access to court

23    records, and we don't receive advance notice of Article 32

24    hearing notices.  We need to start advance notice of Article 32

25    hearing notices.

1    Right now, the guidance that was issued in January,

2  provides for three days advance notice.  That's not sufficient.

3  Not only is it not even being complied with now, it's not

4  sufficient.

5    As we stated in our briefing, our motion for summary

6  judgment, it can take weeks to gain access to a military base.

7  So giving three days advance notice is meaningless.  That

8  notice also does not contain any helpful information to let

9  reporters decide if they actually can spend the time and

10  expense going to these hearings.  We just get the last name of

11  the accused and some sort of code.  We need, at a minimum,

12  charge sheets and the full name of the defendant.

13    So I don't think that's disputed that, right now, the

14  guidance says that they should be giving three days advance

15  notice.  And we need much more than that.  We need sufficient

16  notice so that we can decide if we can attend these Article 32

17  hearings; and, if we want, to attend them.

18    With respect to other court martial records, the undisputed

19  facts are that Pro Publica is denied access at every turn when

20  it seeks these records.  This is not something that Pro Publica

21  should have to request on an individual basis; that's not how

22  the First Amendment works.

23    I heard defense counsel say, "Well, they can ask for it,

24  and then we'll decide."  Well, that turns the presumption of

25  access on its head.  Records are supposed to be available to

1   the public when the First Amendment applies.  And if they don't

2   want to provide them to us in a particular instance, then they

3   have to argue that the compelling interest standard is met with

4   respect to particular documents, with respect to particular

5   proceedings.

6       So the examples we have in our briefing are that we

7   requested cases from -- we requested records from three

8   homicide cases; 91 cases of rape, sexual assaults, and other

9   sexual misconduct; and an unknown number of additional sexual

10  assault cases that we had no information about.  Those are just

11  examples.

12      And so, at a minimum, we would be requesting that this

13  Court order those records produced to us, in addition to the

14  *Mays* court records, without the obscene number of redactions

15  that were applied.  There were redactions applied to the *Mays*

16  court records, which is undisputed.  And if you look at the

17  redactions that were applied, they were applied to the

18  signature lines of pleadings.  You can't even see who the

19  counsel was of the parties.  There were redactions applied

20  everywhere.

21      And then, when they were corrected, they were corrected in

22  ways that, frankly, we had no internal consistency, and made no

23  sense.

24      So these are the examples of what we have asked for and

25  have not received.  But I want to be very clear that it's not

1    our position that we should have to come back to an Article III

2    court every single time we don't get access to records.  We

3    should not have to ask every single time.  It's not a

4    convenience issue.

5        Defendants say that we're trivial -- trivializing national

6    security.  Well, they are trivializing what the press does, and

7    they are trivializing newsworthiness.  Press access is very

8    important.  The press is a surrogate of the public.  It is very

9    important that the public have access to these proceedings,

10   access to what is going on in these courts martial.  That is

11   what was underlying the creation of Article 140(a), is that

12   there was a need for transparency in this system.  There is no

13   transparency in this system.  They are hiding the ball.  And we

14   shouldn't have to ask every time.  The presumption needs to be

15   that these records are contemporaneously posted.

16       If there's a particular issue with a particular record,

17   then we can talk about that then.  But that cannot be the

18   broadscale policy.

19              THE COURT:  Anything else?

20              ATTORNEY MULLIGAN:  No.  Thank you.

21              THE COURT:  Do you want to add something, Mr. Bettwy?

22              ATTORNEY BETTWY:  Thank you, your Honor, just briefly.

23   Thank you.

24       This is an interbranch case, and the only response that I

25   heard was your Honor can look -- and that this wouldn't be the

1   first case to intervene in an interbranch process.  And the

2   only case that Pro Publica mentioned was the *Flint* case, which

3   is a district court case.  It's where a magazine publisher

4   asserted First Amendment right to have magazine correspondents

5   accompany American troops on ground in Afghanistan.  That was

6   not an interbranch case.  Congress had nothing to do with

7   that -- that rule that the military had had in place.

8        So there's no -- this Court would be the first to do that.

9   This is clearly an interbranch process.  And it -- your Honor

10  asked, what are the undisputed facts?  It's just the timeline.

11       And I also want to point out that I -- I wanted to mention

12  a point I forgot to mention.  The general counsel of D.O.D. has

13  issued uniform standards.  Before this whole process began,

14  each department was doing its own thing.  So that's one of the

15  primary things, in addition to -- to increasing public access.

16  But has to make uniform the policies, the practices of the

17  department -- of the different departments.  That's what -- so

18  there has been compliance with that requirement of uniform

19  standards.

20       And if Congress had wanted it to -- to -- to dictate that

21  we have exactly what Pro Publica is asking for, then they could

22  have legislated that, but they didn't.  And they created a

23  process, as well, for a review process, in determining what's

24  the best way -- what are the best practices?  What is

25  practicable?  What is appropriate for military records?  That's

1    a lot of discretion that's being given to the Department of

2    Defense to figure that out, and there are reporting

3    requirements.  Reporting requirements.  And that's in the

4    timeline of the reports that have been made to Congress;

5    including a feasibility report, in which Congress wanted to

6    know -- or, I should say, the Senate and House Committees on

7    Armed Services wanted to know, "How much is this going to cost?

8    How much is it going to cost to establish a Pacer-like system."

9        We forget -- I forget exactly what the number was.  But

10   it's -- it's in the briefing.  And Pro Publica's only remark

11   was, "Well, there's no evidence of that."  Or that's --

12   there's -- anyway, I don't -- I don't -- they just want the

13   Court to ignore that.  But that's something -- the point isn't

14   the amount of money.  It's that Congress recognizes that this

15   will cost money.  And they're asking the D.O.D. to tell them

16   how much it will cost.

17       Okay.  Maybe in the process someone will determine it was

18   overstated, and it could be done for less.  But that's part of

19   the process.

20       I -- I also wanted to address (pause, referring) -- I still

21   have to say that I think Pro Publica's trivializing national

22   security, your Honor.

23       Like they say, "We're not asking for the nuclear codes."

24   You know, so that was it.  That was their -- that was their

25   argument.

1    I -- I do want to read -- I'm sorry.  It will be brief --

2    the preamble to the manual for courts martial.  Manual for

3    courts martial.

4         "The purposes of military law are to promote

5         justice, to deter misconduct, to facilitate

6         accountability, to assist in maintaining good order

7         and discipline in the armed forces, to promote

8         and" --

9         The good part is coming, your Honor.

10        "To promote efficiency and effect -- effectiveness

11        of the military establishment, and thereby to

12        strengthen the national security of the United

13        States."

14    It's all inter -- it's all interrelated.  The -- the

15    procedural rules can't be carved out.  The case management

16    policies and procedures can't be carved out and say, "Oh, look.

17    They have to be the same as the civilian.  We can -- we can

18    just conflate civilian and military when it comes to that

19    aspect."

20        All of it is interrelated, and it all leads to good order

21    and discipline, which is inextricably related to national

22    security but -- thank you, your Honor.

23        THE COURT:  Thank you all.

24    The matter is submitted.

25        ATTORNEY BETTWY:  Thank you, your Honor.

1            ATTORNEY MULLIGAN:  Thank you, your Honor.

2        (Conclusion of proceedings at 4:23 p.m.)

3

4                        --oOo--

5

6    I certify, by signing below, that the foregoing is a correct
     stenographic transcript of the oral proceedings had in the
7    above-entitled matter this 4th day of October, 2025.  A
     transcript without an original signature or conformed signature
8    is not certified.  I further certify that the transcript fees
     and format comply with those prescribed by the Court and the
9    Judicial Conference of the United States.

10              /S/ Amanda M. LeGore

11        AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

12

13

14

15

16

17

18

19

20

21

22

23

24

25